In the Matter of the Guardianship of Jane E. P.:

Grant County Department of Social Services,
Appellant,

v.

Unified Board of Grant and Iowa Counties,
Respondent-Petitioner.

Supreme Court

*No. 2003AP634. Oral argument February 4, 2005.
—Decided July 7, 2005.*

2005 WI 106

(Also reported in 700 N.W.2d 863.)

For the respondent-petitioner there were briefs by *Craig R. Day* and *Law Office of Craig R. Day,* Lancaster, and oral argument by *Craig R. Day.*

For the appellant there was a brief by *Sheila Stuart Kelley* and *Kopp, McKichan, Geyer, Skemp & Stombaugh, LLP,* Platteville, and oral argument by *Sheila Stuart Kelley.*

An amicus curiae brief was filed by *Patricia M. Cavey* and *Tammi, Cohn & Cavey,* Milwaukee; and *Jeffery R. Myer* and *Legal Action of Wisconsin, Inc.,* Milwaukee, on behalf of Legal Action of Wisconsin, Inc., and oral argument by *Jeffery R. Myer.*

An amicus curiae brief was filed by *Edward S. Marion,* Madison, on behalf of Wisconsin Coalition for Advocacy, State Bar of Wisconsin Elder Law Section, Elder Law Center of the Coalition of Wisconsin Aging Groups, Wisconsin Health Care Association and Wisconsin Association of Homes and Services for the Aging.

An amicus curiae brief was filed by *Andrew T. Phillips, Evan N. Claditis* and *Prentice & Phillips LLP,* Milwaukee, on behalf of Wisconsin Counties Association.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, Unified Board of Grant and Iowa Counties, seeks review of a decision of the court of appeals reversing a circuit court order that had dismissed a petition for guardianship and protective placement filed by Grant

County Department of Social Services.[1] The court of appeals examined Wis. Stat. § 55.06(3)(c) (2001–02), which requires a petition be filed in the county of residence of the person to be protected.[2] The petitioner asserts that the court of appeals erred in concluding the statute is unconstitutional in application because it violates the right to interstate travel.

¶ 2. This case presents an opportunity to examine some of the current problems associated with the transfer of interstate guardianships. Based on principles of comity and the orderly administration of justice, we set forth standards for Wisconsin courts to follow when confronted with the transfer of interstate guardianships. These standards will protect the integrity of the original court's determination of what is in the best interests of the ward. Accordingly, we vacate the decision of the court of appeals and remand to the circuit court for the application of the standards set forth here.[3]

I

¶ 3. The facts in this case are brief and undisputed. Jane E.P. is a 47–year-old woman who suffers

---

[1] *Grant County Dep't of Soc. Servs. v. Unified Bd. of Grant and Iowa Counties,* 2004 WI App 153, 275 Wis. 2d 680, 687 N.W.2d 72 (reversing an order of the circuit court of Grant County, Robert P. Van De Hey, Judge).

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

[3] We do not address the constitutional issue in this majority opinion. For a discussion of the constitutional issue, see the concurrence and dissent to this opinion. Justice Crooks's concurrence, ¶¶ 52–57; Justice Roggensack's concurrence/dissent, ¶¶ 78–87. Justice Crooks's concurring opinion is the majority opinion on the constitutional issue.

from Wernicke's encephalopathy.[4] Due to this condition, she is substantially incapable of managing her personal finances and property and cannot care for herself. Jane currently resides at the Galena Stauss Nursing Home in Galena, Illinois, where she has lived the past five years. She was placed there pursuant to an order of the court in Jo Daviess County, Illinois. Jane's guardian is her sister, Deborah V.

¶ 4.    Many of Jane's relatives live in Grant County, Wisconsin, just across the Illinois border. They wanted to move Jane to Southwest Health Center Nursing Home, a private facility in Cuba City, Wisconsin. Through its corporation counsel, the Grant County Department of Social Services (hereinafter "Grant County") petitioned for guardianship and protective placement at Southwest Health Center Nursing Home. The petition nominated Deborah V. to remain as Jane's guardian.

¶ 5.    As part of its proceedings, the circuit court ordered the Unified Board of Grant and Iowa Counties (hereinafter "Unified") to make a comprehensive evaluation of Jane.[5] Instead, Unified moved to dismiss the

---

[4] Wernicke's encephalopathy is "a neurological disorder characterized by confusion, apathy, drowsiness, ataxia of gait, nystagmus, and ophthalmoplegia. It was first described by [German neurologist Karl] Wernicke in 1881 and is now known to be due to thiamine deficiency, usually from chronic alcohol abuse." *Dorland's Illustrated Medical Dictionary* 591 (29th ed. 2000).

[5] The Unified Board of Grant and Iowa Counties was established under Wis. Stat. § 51.42(3)(a) to "administer a community mental health, developmental disabilities, alcoholism and drug abuse program, make appropriations to operate the program and authorize the county department of community programs to apply for grants-in-aid under s. 51.423."

guardianship and protective placement for lack of competency of the court to proceed. It maintained that Jane was a resident of Illinois and Wis. Stat. § 55.06(3)(c) required her to be a Wisconsin resident at the time of filing.[6] The circuit court agreed with Unified and dismissed the matter based upon Jane's non-residency.

¶ 6. The court of appeals reversed the order of the circuit court. It determined that Wis. Stat. § 55.06(3)(c), as applied to Jane, violated her constitutional right to interstate travel. *Grant County Dep't of Soc. Servs. v. Unified Bd. of Grant and Iowa Counties,* 2004 WI App 153, ¶ 22, 275 Wis. 2d 680, 687 N.W.2d 72. In doing so, the court of appeals relied on *Bethesda Lutheran Homes and Services Inc. v. Leean,* 122 F.3d 443 (7th Cir. 1997), *appeal after remand,* 154 F.3d 716 (1998), which, although not binding on state courts, held under similar circumstances that Wis. Stat. § 55.06(3)(c) impeded the constitutional right to travel.

¶ 7. The *Bethesda Lutheran* court explained, "[s]ince anyone who is approved for protective placement is by definition incapable of living outside [a facility] it is unclear where in Wisconsin the applicant for admission to the [Wisconsin] facility is supposed to live while the placement is being processed." *Id.* at 446. Following this reasoning, the court of appeals concluded, "because Jane is incompetent and cannot first move to Wisconsin and have a petition for protective placement filed on her behalf, § 55.06(3)(c), as applied to Jane, unconstitutionally burdens her right to travel." *Grant County,* 275 Wis. 2d 680, ¶ 17. Unified subsequently petitioned this court for review.

---

[6] Wisconsin Stat. § 55.06(3)(c) provides that "The petition shall be filed in the county of residence of the person to be protected."

## II

¶ 8.   As noted above, this case presents an opportunity to examine some of the current problems associated with the transfer of interstate guardianships. We begin our discussion with a brief overview of the emergence of interstate guardianships. Next, we address some of the questions interstate guardianships raise and consider various responses of different jurisdictions. Then, we turn to the arguments of the parties in the present case. Finally, we set forth standards for Wisconsin courts to follow when confronted with interstate guardianships.

### A

¶ 9.   The fact that American society has become increasingly mobile should come as no surprise to most observers. Over 15 percent of Americans change their residence each year, with 3 percent of them moving to another state. Charlene D. Daniel & Paula L. Hannaford, *Creating the "Portable" Guardianship: Legal and Practical Implications of Probate Court Cooperation in Interstate Guardianship Cases,* 13 Quinnipiac Prob. L.J. 351 (1999). While the vast majority of these movers are relatively young, nearly 5 percent of people age 65 and older also move each year. *Id.* at 352.

¶ 10.   Likewise, it is well documented that American society is living longer than ever due to advancements in health, science, and medicine. Presently, individuals age 65 and older represent 12 percent of the U.S. population, up from 4 percent in 1900. Peggie R. Smith, *Elder Care, Gender, and Work: The Work-Family Issue of the 21st Century,* 25 Berkeley J. Emp. Lab. L. 351, 352 (2004). By 2030, that figure is expected

to increase to 20 percent. *Id.*[7] Along with this rise in the elderly population comes an increase in Alzheimer's, dementia, and other incapacitating diseases that interfere with the ability to live independently.

¶ 11. The convergence of these developments has significant implications for the administration of Wisconsin's guardianship system.[8] As one commentator explained, "[f]requently elderly parents choose their adult children as their primary caretakers. Therefore, in this age of geographic mobility, children often must make arrangements for their parents to relocate to the state where the children live." Ryan Vincent, *As America Ages: Changing the Domicile of the Incompetent Challenges Diversity Jurisdiction,* 43 Washburn L.J. 513 (Winter 2004). As a result, the number of interstate guardianships is likely to increase in Wisconsin as well as nationwide.[9]

---

[7] By 2030, the population of individuals age 65 or older is expected to reach 70 million, more than double the number in 1998. Erica Wood, *Dispute Resolution and Dementia: Seeking Solutions,* 35 Ga. L. Rev. 785, 788 (2001).

[8] Although the ward in this case is only 47 years old, these developments were not lost upon the parties. As counsel for Grant County observed at oral argument, "we are going to find ourselves in these situations more and more frequently as our population ages and people are continuing to be mobile."

[9] Numerous factors contribute to the increase of interstate guardianships:

> The ward, his or her guardian, family or assets may be located outside of the jurisdiction of the court that originally established the guardianship. Some incapacitated adults desire to be closer to family or may need to be placed in a different, more suitable health care or living arrangement. Family caregivers that relocate for employment reasons reasonably may wish to bring the ward with them. The ward's real or personal property

## B

¶ 12. With the increase of interstate guardianships comes a host of difficult questions. The questions surrounding the interstate transfer of guardianships are of vital importance to Wisconsin families and their loved ones. In many simple cases the conclusion is obvious: it is in the best interest of the ward to be near those who will love, care for, and comfort the ward. But not all cases are so easily resolved. Quite the contrary.

¶ 13. Some jurisdictional questions involving the interstate transfer of guardianship pose complex legal and procedural issues laden with serious public policy questions. What happens when the relatives are in different states and are fighting over which state most appropriately should exercise jurisdiction? What happens when the motives are not based on what is in the best interest of the ward, but rather on the fortune of the ward who has property in several states? Should wards be transferred to states for the purpose of being subject to more favorable "right to die" laws or assisted suicide legislation?

¶ 14. As case law from other jurisdictions demonstrates, courts have struggled mightily with problems associated with interstate guardianships. Indeed, "no-

> may remain in the existing jurisdiction, however, even after the ward has moved. Interfamily conflict or attempts to thwart jurisdiction may occur less frequently, but still cause significant problems for courts. Guardians and family members, for example, may engage in forum shopping for Medicaid purposes or for state laws governing death and dying that are compatible with their views or the views of the ward.

National Probate Court Standard 3.5, Commission on National Probate Court Standards and Advisory Committee on Interstate Guardianships, a Project of the National College of Probate Judges and the National Center for State Courts.

where are the legal issues associated with interstate guardianships more difficult to resolve than in cases that raise the question of a court's jurisdiction to establish a guardianship or to determine which court should hear a guardianship matter when multiple courts have jurisdiction." Daniel, *Creating the "Portable" Guardianship,* at 355. Three cases illustrate this point: *Mack v. Mack; In re Guardianship of Margaret Enos;* and *In re Guardianship of Ralph DeCaigny.* We consider each one in turn.

¶ 15.  In *Mack v. Mack,* 618 A.2d 744 (Md. 1993), the Maryland court of appeals heard a dispute over the guardianship of a man left in a persistent vegetative state after an automobile accident. The man's wife was initially appointed guardian for her husband in Maryland. However, after moving to Florida, she sought a guardianship appointment from a Florida circuit court and a discharge from the Maryland guardianship order, which were both granted. Upon learning that she had petitioned the Florida court for permission to withhold nutrition and hydration for the man, the man's father filed a petition for appointment as guardian in Maryland. Thus, the court was faced with a jurisdictional question, stemming from an intrafamily conflict over the continuation of treatment for a loved one.

¶ 16.  The Maryland court of appeals concluded that "[t]he guardian's authority is not derived from the ward, but from the appointing court for which the guardian acts as agent, exercising those powers conferred by statute or by the court." *Mack,* 618 A.2d at 750. Therefore, the man's wife, simply by virtue of being his guardian, could not appear in a Florida court and consent to the exercise of jurisdiction over him. *Id.* The court of appeals noted that the man never lived in Florida, and that there was no evidence that he ever intended to live there. *Id.* at 751. Accordingly, it refused

267

to afford full faith and credit to the Florida court judgment appointing the wife guardian. *Id.*

¶ 17. As commentators Charlene D. Daniel and Paula L. Hannaford explain, it is difficult to examine the jurisdictional question in *Mack* because the issue is so closely tied to the substantive question underlying the dispute: the appointment of a guardian who will act in the best interests of the ward. Daniel, *Creating the "Portable Guardianship"*, at 358. They note that the court of appeals in *Mack* "conveniently glosses over" the fact that a Maryland court had discharged the previous guardianship, presumably because it recognized that Florida had jurisdiction. *Id.*

¶ 18. A more satisfying analysis of jurisdictional issues can be found in *In re Guardianship of Margaret Enos,* 670 N.E.2d 967 (Mass. Ct. App. 1996), where the court considered and deferred to another court of competing jurisdiction. There, the Massachusetts court of appeals heard a guardianship petition filed by the daughter of a Florida woman who had transferred her mother from Florida to Massachusetts without the authorization of either a Florida court or the not-for-profit charitable corporation that had been appointed guardian of the mother. In her petition, the daughter argued, among other things, that the Florida guardianship decision was not entitled to full faith and credit in Massachusetts.

¶ 19. The Massachusetts court of appeals acknowledged that it was not obligated to grant full faith and credit to a foreign guardianship if the best interests of the ward required otherwise. *Enos,* 670 N.E.2d at 968. It concluded, however, that there was no reason for not granting full faith and credit given the evidence presented. *Id.* at 969. The court also emphasized that, regardless of the validity of the daughter's claims concerning the mother's alleged mistreatment, she needed

to pursue her claims in Florida for reasons of full faith and credit, interstate comity, and the superior convenience of the forum. *Id.*

¶ 20. Finally, *In re Guardianship of Ralph DeCaigny,* No. C3–93–1269, 1994 Minn. App. LEXIS 126 (Minn. Ct. App. Feb. 1, 1994) is another case worth noting for the respect one state court afforded another. There, the Minnesota court of appeals considered whether a Minnesota circuit court had jurisdiction to remove two guardians appointed to the ward's person by a circuit court in New Mexico. The circuit court, which had previously appointed a Minnesota bank as conservator of the ward's property located within the state, determined that the out-of-state guardians had mismanaged the ward's funds, failed to make the necessary reports on the ward's finances, and improperly used the ward's property. After consulting with the New Mexico circuit court, the Minnesota circuit court ordered the removal of the New Mexico guardians.

¶ 21. Although the court of appeals lauded the comity and cooperation demonstrated by the two circuit courts, it felt compelled to reverse the removal order on grounds that Minnesota does not have jurisdiction to remove out-of-state guardians appointed by out-of-state courts. Daniel, *Creating the "Portable" Guardianship,* at 361 (citing *DeCaigny,* 1994 Minn. App. LEXIS 126 at 3). Accordingly, the court of appeals concluded that any removal of the appointment of the guardians from New Mexico was in error. *Id.*

¶ 22. As these three cases demonstrate, jurisdictional questions in the context of interstate guardianship cases can present thorny problems for courts. This is especially true in cases like *Mack* where jurisdiction is used as a procedural vehicle to advance the parties' substantive claims concerning the continuation of

269

treatment or the right to die. However, as the cases of *Enos* and *DeCaigny* reveal, courts can and do endeavor to afford respect for the proceedings of another legal system. Encouraging cooperation and consideration among courts of different jurisdictions is critical to furthering the dignity of the judicial system and promoting the orderly administration of justice.

## C

¶ 23.   With the foregoing background in mind, we turn to the arguments of the parties in the present case. Here, Unified asserts that Wis. Stat. § 55.06(3)(c) is constitutional because it does not burden Jane's right to travel and is a bona fide residency requirement. In the alternative, it maintains that even if Jane's right to travel is burdened, such a burden is justified by the fiscal impact that counties and the State would suffer by providing services to nonresidents. Grant County, meanwhile, submits that Wis. Stat. § 55.06(3)(c) improperly infringes on Jane's constitutional right to interstate travel. It declares that the statute acts as a total bar to travel for Jane and others similarly situated.

¶ 24.   Lost in these arguments, of course, is the court in Jo Daviess County, which is charged with the responsibility of ensuring Jane's safety and well-being and has already determined that placement at Galena Stauss Nursing Home is in her best interests. If there is to be any comity between Illinois and Wisconsin, the analysis should begin there.[10]

---

[10] At oral argument, the parties acknowledged that they did not go to the court in Jo Daviess County and ascertain whether there would be any objection to transferring the ward to Wisconsin.

¶ 25. Comity is based on respect for the proceedings of another system of government. *Teague v. Bad River Chippewa Indians,* 2003 WI 118, 265 Wis. 2d 64, ¶ 69, 665 N.W.2d 899 (Abrahamson, C.J., concurring for a majority of the court). The doctrine "is neither a matter of absolute obligation nor of mere courtesy and good will, but is recognition which one state allows within its territory to legislative, executive, or judicial acts of another, having due regard to duty and convenience and to rights of its own citizens." *Id.* (citations omitted).

¶ 26. Given today's aging and mobile society, we believe that interstate cooperation between courts is vital. Such cooperation promotes confidence in the judicial system, and enhances the efficient use of judicial resources. Indeed, a little cooperation in the present case might have solved the problem and avoided the constitutional issue altogether.

¶ 27. The problem in this case and others like it is that current laws are generally insufficient to assist courts and litigants in resolving multi-jurisdictional issues stemming from interstate guardianships. To be sure, there are exceptions.[11] For example, Indiana's

---

[11] According to one commentator, several states have established procedures to transfer a case to a new jurisdiction where the ward has relocated. Sally Balch Hurme, *Mobile Guardianships: Partial Solutions to Interstate Jurisdiction Problems,* 17 NAELA Quarterly 6, 10 (Summer 2004) (citing Ala. Code § 26–2A-111 (2003), Alaska Stat. § 13.26.155 (2003); Ariz. Rev. Stat. § 14–5313 (2003), Colo. Rev. Stat. § 15–14–107 (2003), Idaho Code § 15-5-313 (2003), Ind. Code § 29–3-9-2 (2003), Kan. Stat. Ann. § 59–3061 (2003), Mo. Rev. Stat. § 475.055 (2003), N.H. Rev. Stat. Ann. § 464–A:44 (2003), Or. Rev. Stat. § 125.540 (2003), S.C. Code Ann. §§ 62–5-313 & -431 (2003),

code expressly extends the extraterritorial reach of its guardians and gives an Indiana guardian the authority to place the ward in another state, with court approval. Ind. Code § 29–3–9–2 (2003). Moreover, Kansas sets forth a highly detailed process to petition the court to give full faith and credit to the prior adjudication, appoint a guardian or conservator, and terminate the other state's proceedings. Kan. Stat. Ann. § 59–3061 (2003). However, neither Wisconsin nor Illinois has comparable provisions.

¶ 28. We strongly encourage the legislature to address this issue. In facilitating this end, we direct its attention to the work of both the National College of Probate Judges and the National Conference of Commissioners on Uniform State Laws referenced later in this opinion. However, in the absence of legislative guidance, we set forth standards for Wisconsin courts to follow when confronting cases associated with the interstate transfer of guardianships.

## D

¶ 29. We determine that principles of comity should be applied in this case. In *Teague*, 265 Wis. 2d 64, this court applied principles of comity to resolve a dispute between two courts of competing jurisdiction. There, a tribal court and a circuit court exercised jurisdiction over the same dispute between Teague and the Bad River Band about termination of Teague's employment with the tribe. The two courts had reached opposite results, and each party wanted this court to give effect to the judgment in its favor.

S.D. Codified Laws §§ 29A-5–109 & -114 (2003), Tenn. Code Ann. § 34–11–117 (2003), Vt. Stat. Ann. tit. 14 § 2923 (2003), W. Va. Code § 44A-1–7 (2003)).

¶ 30. To resolve the matter, and provide guidance for future cases, we set forth a list of factors for state and tribal courts to consider when determining "which of two courts should proceed to judgment and which court should abstain and cede its jurisdiction." *Id.,* ¶ 71. (Abrahamson, C.J., concurring for a majority of the court). The factors stemmed from a number of sources discussing comity, allocation of jurisdiction, and enforcement of judgment. *Id.,* ¶ 71 n.15.

¶ 31. Courts must work together in respect and cooperation to further the dignity of the judicial system and to promote the orderly administration of justice. Accordingly, as in *Teague,* we set forth standards for Wisconsin courts to follow when confronted with interstate guardianships.[12] These standards, steeped in a spirit of comity, promote the orderly administration of justice. The standards we provide are not made out of whole cloth. Rather, they stem from an addendum to the National Probate Court Standards regarding the subject of transfer of interstate guardianships.[13] The hallmarks of these standards are communication and

[12] We note that in the context of family law and child custody, the legislature has established procedures to follow to resolve jurisdictional conflict. See Uniform Child Custody Jurisdiction Act, Wis. Stat. ch. 822; Wis. Stat. § 767.025(1).

[13] The National Conference of Commissioners on Uniform Laws (NCCUSL) has also provided a framework for transferring the jurisdiction of guardians. See Section 107 of the Uniform Guardianship and Protective Placement Act (1997) (UGPPA). Under the UGPPA, a foreign guardian may petition for appointment in the new state if venue is or will be established. *Id.* To date, the UGPPA has been adopted by Alabama, Colorado, Hawaii, Minnesota, and Montana. We note that NCCUSL is beginning the process of considering whether a revision to the UGPPA or a stand-alone jurisdictional provision

273

notice. First, we briefly explain the background of the addendum. Then, we set forth its standards and relevant commentary.

¶ 32. In the absence of any widely accepted model of interstate communication for courts of probate jurisdiction, the National College of Probate Judges (NCPJ)[14] initiated a research project with the National Center for State Courts (NCSC) to study the incidence of interstate guardianships and to explore avenues for facilitating interstate communication and cooperation. Final Report of the NCPJ Advisory Committee on Interstate Guardianships, Presented to: National College of Probate Judges October 12, 1998, 1.

¶ 33. According to the study, difficulties of interstate guardianship arose most often in monitoring and enforcement, jurisdiction disputes, navigating the laws governing property management in other states, obtaining investigatory reports and testimony from persons located in other states, and communications with courts and attorneys in other states. *Id.* at 2–3. In response to these concerns, the Advisory Committee drafted five standards which address the following items: (1) Communication and Cooperation Between Courts; (2) Screening and Review of Petition; (3) Transfer of Guardianship; (4) Receipt and Acceptance of a Transferred Guardianship; and (5) Initial Hearing in the Court accepting the Transferred Guardianship. *Id.* at 4.

---

should be proposed. See Hurme, *Mobile Guardianships,* 17 NAELA Quarterly at 12; see also http://www.nccusl.org/Update/.

[14] Established in 1968, the National College of Probate Judges (NCPJ) is composed primarily of judges and probate court administrators and includes members from nearly every state.

¶ 34. Central to the standards is the concept of "portability," the idea that guardianships should be able to be "exported" or "imported" from one state to another absent a showing of abuse of the guardianship. *See* National Probate Court Standard 3.5, Commission on National Probate Court Standards and Advisory Committee on Interstate Guardianships, a Project of the National College of Probate Judges and the National Center for State Courts (hereinafter "National Probate Court Standards"). The drafters intended "to facilitate —and not impede unnecessarily the movement of [guardianships] across state lines" by requiring specific steps to be completed by the transferring and accepting courts. *Id.* They reasoned, "[s]tandards of access to justice and the principle of comity require courts to remove those barriers that impede litigants' participation in the legal system even when that participation requires the engagement of court systems in different states." *Id.* We now set forth the National Probate Court Standards applicable to the present case, along with selected relevant commentary.

¶ 35. "STANDARD 3.5.1 COMMUNICATION AND COOPERATION BETWEEN COURTS. Probate courts in different jurisdictions and states should communicate and cooperate to resolve guardianship disputes and related matters. Working in consultation with appropriate groups and organizations, probate courts should develop and implement rules, codes and standards of ethics, and administrative procedures that encourage communication and cooperation between and among courts." National Probate Court Standard 3.5.1.

¶ 36. The Commentary to Standard 3.5.1 notes that this provision extends the requirement of indepen-

dence and comity to a circuit court's relationship with courts in other jurisdictions and recognizes that the ends of justice are more likely to be met when courts communicate and cooperate to resolve guardianship matters that cross state lines. *Id.,* cmt. The Commentary also emphasizes that in matters pertaining to the alleged incapacitated person's temporary residence or location in another state, as well as in matters in which two or more courts have jurisdiction, the courts should communicate among themselves to resolve any problems or disputes. *Id.*[15]

¶ 37. "STANDARD 3.5.3 TRANSFER OF GUARDIANSHIP. (a) Upon receipt of proper notice of an intended transfer of a guardianship, and a satisfactory final report of the guardian, and in the absence of meritorious objections by interested persons, the probate court should transfer the guardianship to a foreign

---

[15] Standard 3.5.2 pertains to the recommended screening and review process of a petition for guardianship. Although it is not the focus of our discussion in the present case, we set forth its text for guidance in future cases.

> STANDARD 3.5.2 SCREENING AND REVIEW OF PE-TITION. (a) As part of its review and screening of a petition for guardianship, the probate court should determine that: (1) the proposed guardianship is not a collateral attack on an existing or proposed guardianship in another jurisdiction or state; and, (2) for cases in which multiple states may have jurisdiction, the probate court should determine that the petition for guardianship has been filed in the court best suited to consider the matter. (b) When competing guardianship petitions are filed in two or more different courts with jurisdiction, the probate court in which the earliest petition is filed should, upon review of the petition, determine the proper venue for hearing the case.

National Probate Court Standard 3.5.2.

jurisdiction within a reasonable amount of time. (b) The ward and all interested persons should be served with proper notice of the intended transfer and be informed of their right to file objections and to request a hearing on the petition. (c) The final report of the guardian should contain sufficient information for the court to determine that the general plans for the ward and his or her assets in the foreign jurisdiction are reasonable and sufficient." National Probate Court Standard 3.5.3.

¶ 38.  The Commentary to Standard 3.5.3 notes that the Standard is consistent with and extends to interstate guardianships the provisions for reports by a guardian, and state requirements for annual reports and accountings by the guardian. *Id.,* cmt. Its intent is to facilitate the transfer of guardianships to another state in cases in which the court is satisfied that the guardianship is valid and that the guardians have performed their duties properly in the interests of the ward for the duration of their appointment. *Id.* The Standard is based on the presumption that most guardians are acting in the interest of the ward and that the notice and reporting requirements, and the opportunity to bring objections to the transfer to the attention of the court, are sufficient checks on the appropriateness of the transfer. *Id.*[16]

¶ 39.  The Commentary further notes that, in general, receiving courts should allow the guardianship to be "imported," giving full faith and credit to the terms

[16] We emphasize the importance of notice because the transfer of a guardianship is ultimately an administrative procedure that does not require a determination by the foreign court of the ward's incapacity or the appropriateness of the guardian's appointment and assigned powers and responsibilities.

and powers of foreign guardianship orders. *Id.* However, enforcement and necessary administrative changes (e.g., bond requirements, periodic reporting requirements, appointment of guardian ad litem or court visitor) of the guardianship may be made to bring the guardianship into compliance with the requirements of the receiving jurisdiction. *Id.* Ideally, those changes should be made in accordance with the receiving court's monitoring and review schedule and requirements. *Id.* However, courts may choose to have an expedited review hearing upon receipt and acceptance of the foreign guardianship. *Id.* Cooperation and communication, and a proper distribution of responsibilities among states, should facilitate the movement of guardianships and should be such that the parties would see it in their interests to comply with the requirements. *Id.*

¶ 40. In addition, the Commentary recognizes that, as a matter of good practice, guardians should always provide the court, the ward, and all interested persons advance notice of an intended transfer of the guardianship or movement of the ward or property from the court's jurisdiction. *Id.* Guardians should be familiar with the laws and requirements of the new jurisdiction. *Id.* No hearing on the transfer is necessary unless scheduled by the court sua sponte or requested by the ward or interested persons named in the original petition. However, the ward and all interested persons should be informed of their right to request a hearing. *Id.* After all, the intent is not to restrict freedom, or to bar or restrict travel or changes in residence, but to encourage the best possible treatment of the ward according to their best interests. *Id.*

¶ 41. Finally, the Commentary states that, in general, a guardianship or a ward or the ward's property

may be moved to another jurisdiction with the approval of the sending court. *Id.*[17] The court's approval should be conditioned upon certain requirements including the absence of pending disciplinary actions against the guardian, approval by the court of a final financial accounting, and a satisfactory final report of the condition of the ward. *Id.* Bond or other security requirements imposed by the exporting court should be discharged only after a new bond, if required, has been imposed by the receiving court. *Id.* Debtor issues also may need to be dealt with in accordance with existing state laws. *Id.*

¶ 42. "STANDARD 3.5.4 RECEIPT AND ACCEPTANCE OF A TRANSFERRED GUARDIANSHIP. Upon receipt of a properly executed request for a transfer of a guardianship certified by a foreign jurisdiction, and subject to the provisions of Standard 3.5.5, the probate court should recognize the appointment and powers of the guardian and accept the guardianship under the terms as specified in the transferred guardianship order. Acceptance of the transferred guardianship can be made without a formal hearing unless one is requested by the court sua sponte or by motion of the ward or by any interested person named in the transfer documents. The court should notify the foreign court of its receipt and acceptance of the transfer." National Probate Court Standard 3.5.4.

---

[17] This comment, of course, is directly applicable to the case at hand. If the court in Jo Daviess County approves the transfer, Jane's guardian could then seek to have Jane protectively placed in Wisconsin. However, to allow Jane's guardian to unilaterally move Jane would severely undermine Illinois' guardianship system and create an unnecessary conflict between the Wisconsin and Illinois courts.

¶ 43. The Commentary to Standard 3.5.4 provides that, subject to the provisions of the Standard, a court should recognize and accept the terms of a foreign guardianship that has been transferred with the approval of the exporting court. *Id.,* cmt. The receiving court should notify the exporting court and acknowledge that it has accepted the guardianship. *Id.* Receipt of this notice can serve as the basis for the exporting court's termination of its guardianship. *Id.* Consistent with the Standard, a court should cooperate with the foreign court to facilitate the orderly transfer of the guardianship. *Id.* To coordinate the transfer, it can delay the effective date of its acceptance of the transfer, make its acceptance contingent upon the discharge of the guardian by the foreign court, recognize concurrent jurisdiction over the guardianship, or make other arrangements in the interests of the parties or of justice. *Id.*

¶ 44. "STANDARD 3.5.5 INITIAL HEARING IN THE COURT ACCEPTING THE TRANSFERRED GUARDIANSHIP. (a) No later than ninety (90) days after acceptance of a transfer of guardianship, the probate court should conduct a review hearing of the guardianship during which it may modify the administrative procedures or requirements of the guardianship in accordance with local and state laws and procedures. (b) Unless a change in the ward's circumstances warrants otherwise, the probate court should give effect to the determination of incapacity and recognize the appointment of the guardian and his or her duties, powers and responsibilities as specified in the transferred guardianship." National Probate Court Standard 3.5.5.

¶ 45. The Commentary to Standard 3.5.5 provides that the court should schedule a review hearing within 60 days of receipt of a foreign guardianship. *Id.,* cmt.

280

The review hearing allows the court to inform the ward and guardian of any administrative changes in the guardianship (e.g., bond requirements or reporting procedures) that are necessary to bring the foreign guardianship into compliance with state or local law. *Id.* Unless requested to do otherwise by the ward, the guardian, or an interested person because of a change of circumstances, the court should give full faith and credit to the terms of the existing guardianship concerning the rights, powers, and responsibilities of the guardian. *Id.*

¶ 46. We recognize that the standards will not solve every problem associated with interstate guardianships.[18] However, in the spirit of comity and to promote the orderly administration of justice, they are to be employed for the interstate transfer of guardianships. These standards will help Wisconsin courts facilitate the geographic mobility of those individuals that guardianship orders were designed to protect. In the present case, they will protect the integrity of the original court's determination of what is in the best interests of Jane, while recognizing her ability to change residence as expressed through a guardian.

---

[18] For example, one of the practical concerns raised by Unified at oral argument was how it will be able to complete a comprehensive evaluation of someone who is located out-of-state. In this case, the close proximity of the ward does not pose a problem. However, in other cases, it might.

In those cases where the ward's location is of great distance, bodies like Unified need not travel to complete a comprehensive evaluation. Rather, they can obtain medical information via fax or mail and conduct telephone interviews of relevant people, including family members and employees at the facility where the ward resides. As technology increases, videoconferencing may be another possibility.

¶ 47. Accordingly, on remand, Grant County should petition the court in Jo Daviess County for transfer of Jane's guardianship. Likewise, it should petition the court in Grant County for the receipt and acceptance of Jane's guardianship.[19] During this process, Grant County shall serve Jane and all interested persons with proper notice of the intended transfer and inform them of their right to file objections and to request a hearing on the petition. This requirement is important to prevent the transfer of a guardianship for inappropriate purposes.

¶ 48. Assuming that there are no objections and that the court in Jo Daviess County approves of the transfer, the court in Grant County should allow the guardianship to be "imported," giving full faith and credit to the terms and powers of the foreign guardianship order. Administrative changes of the guardianship may be necessary to bring the guardianship into compliance with the requirements of Wisconsin law. However, if these steps are completed, the court in Grant County will be able to place Jane at Southwest Health Center Nursing Home without hearing a new petition for protective placement. This will avoid the residency requirement of Wis. Stat. § 55.06(3)(c).

[19] For more explicit guidance as to what the petitions and notice should include, we refer the parties to the model legislation for the interstate transfer of guardianship orders with associated forms. Final Report of the NCPJ Advisory Committee on Interstate Guardianships, Presented to: National College of Probate Judges October 12, 1998, Appendix D. This report can be accessed at http://www.ncsconline.org/WC/Publications/Res_CusSup_InterstateGuardianPub.pdf.

### III

¶ 49. In sum, this case presents an opportunity to examine some of the current problems associated with the transfer of interstate guardianships. Based on principles of comity and the orderly administration of justice, we have set forth standards for Wisconsin courts to follow when confronted with the transfer of interstate guardianships. These standards will protect the integrity of the original court's determination of what is in the best interests of the ward. Accordingly, we vacate the decision of the court of appeals and remand to the circuit court for the application of the standards set forth here.

*By the Court.*—The decision of the court of appeals is vacated and the cause is remanded to the circuit court.

¶ 50. N. PATRICK CROOKS, J. *(concurring).*

### PART I.

¶ 51. I join the majority opinion and its adoption of standards for Wisconsin courts to follow when presented with cases involving the transfer of a guardianship from another state. As such, I agree that the decision of the court of appeals should be vacated, and that this case should be remanded to the circuit court for the application of those standards. I also join Section D of Justice Patience Drake Roggensack's concurrence/dissent, which states that Wis. Stat. § 55.06(3)(c) (2001–02) is constitutional as applied to Jane E.P.

### PART II.

¶ 52. I write separately to lend further support to her conclusion as to the constitutionality of Wis. Stat.

§ 55.06(3)(c), and to distinguish the present case from *Bethesda Lutheran Homes and Services, Inc. v. Leean,* 122 F.3d 443 (7th Cir. 1997).[1]

¶ 53.  In *Bethesda Lutheran,* the federal court of appeals found Wis. Stat. § 55.06(3)(c) was unconstitutional. While I recognize that such a decision is not binding on this court, I feel that an analysis of the case is warranted, because the decision of the Wisconsin Court of Appeals relied on that holding in the present case. In *Bethesda Lutheran,* four nonresidents of Wisconsin filed a civil rights action under 42 U.S.C. § 1983 involving Bethesda Lutheran Homes, a private care facility located in Watertown, Wisconsin. That facility was one that provided care and treatment for the mentally retarded.[2] All four nonresident plaintiffs were retarded, with IQs between 10 and 34, and none was considered competent to manage his or her own affairs. *Id.* at 444. These plaintiffs alleged that that the residency requirement of § 55.06(3)(c) impeded their constitutional right to travel by preventing them from moving to the care facility from their current out-of-state homes or group homes.

¶ 54.  The Seventh Circuit Court of Appeals concluded that the State of Wisconsin did not establish that there was a rational basis for the residence requirement in Wis. Stat. § 55.06(3)(c). The court held, specifically,

---

[1] Justices Jon P. Wilcox, David T. Prosser and Patience Drake Roggensack join Part II of this opinion, so that this opinion is the majority opinion on the constitutional issue. Justice David T. Prosser also joins the majority opinion and its adoption of standards for Wisconsin courts.

[2] The federal suit was filed by seven plaintiffs—three current residents of the facility, and four prospective residents from out-of-state. For the purposes of the present case, the claims of the out-of-state residents are relevant.

that "*no plausible justification for it has been suggested.* The plausible justifications were not argued at all, and the implausible ones were abandoned at the end of oral argument." *Id.* at 447 (emphasis added). This statement resulted from the court's view that the State of Wisconsin had failed to provide a reasonable justification for the residence requirement. Notably, the court did not say that no plausible explanation for such a requirement existed; rather, the court stated that no plausible justification had even been proposed.

¶ 55. This case, however, is clearly distinguishable. The Unified Board of Grant and Iowa Counties (Unified) made plausible arguments, and provided testimony on the record, to justify the residence requirement in Wis. Stat. § 55.06(3)(c). It contended, unlike the State of Wisconsin in *Bethesda Lutheran,* that the fiscal concerns associated with the guardianship and protective placement of patients such as Jane E.P. provides a rational justification for residence requirements. The financial burden on Iowa and Grant Counties was shown to be a significant one.

¶ 56. The record includes substantial evidence in that regard. During testimony at the hearing before the circuit court on the motion to dismiss, Neil Blackburn, the director of Unified Community Services of Grant and Iowa Counties, stated that Unified has a $860,000 annual cost for 21 individuals in community based residential facilities (CBRF). He noted that if a person needs to be moved from a nursing home to a CBRF that there is an obligation to provide such services.[3] He

---

[3] We recognize that the court of appeals noted that Jane E.P.'s nursing home expenses in Illinois are currently covered by Medicaid, which would similarly cover her expenses at a Wis-

testified that the total expenditure, annually, for Unified Community Services is approximately $8,500,000. He stated that there are currently 76 protectively placed persons that Unified is responsible for, that about 60 Wisconsin residents are currently on Unified's waiting list for protective placement, and that there is no money available to help support those developmentally disabled individuals, since the agency annually has a deficit.

¶ 57.   I am convinced that this record is sufficient to establish a rational justification for the residency requirement. I therefore agree that the statute is "rationally related to protecting and preserving the county's and the State's ability to provide services to its own bona fide residents in preference to those persons who reside in other states." Justice Patience Drake Roggensack's concurrence/dissent, ¶ 84.

PART III.

¶ 58.   In sum, I conclude that the decision of the Seventh Circuit Court of Appeals in *Bethesda* is distinguishable for the reasons set forth, and, therefore, does

consin nursing home. *Grant County Dep't of Soc. Servs. v. Unified Bd. of Grant and Iowa Counties*, 2004 WI App 153, ¶ 15, 275 Wis. 2d 680, 687 N.W.2d 72. However, the record reveals there has been no comprehensive evaluation of Jane E.P. to determine which type of facility would be appropriate for her in Wisconsin's protective placement system. While the state would bear a portion of the expense of Jane E.P's treatment in a nursing home, Wisconsin would likely bear more of the financial burden if she were to be placed in, or transferred to, a state institution, a community based residential facility, a family home, or a supervised apartment. Once the state begins providing services for individuals with developmental disabilities, the arrangement generally continues for life.

not assist us in reaching an appropriate outcome in this case. I also join the majority opinion and its adoption of standards for Wisconsin courts in cases involving the transfer of a guardianship from another state.

¶ 59. For the reasons stated herein, I respectfully concur.

¶ 60. I am authorized to state that Justices JON P. WILCOX, DAVID T. PROSSER, AND PATIENCE DRAKE ROGGENSACK join Part II of this concurrence, and Justice DAVID T. PROSSER also joins the majority opinion and its adoption of standards for Wisconsin courts.

¶ 61. PATIENCE DRAKE ROGGENSACK, J. (*concurring in part and dissenting in part*). The majority opinion sets up an elaborate system of steps and requirements, both in regard to time and substance, that it directs the circuit court to make in order to decide whether the guardianship and protective placement of Jane E.P. that were issued in Jo Daviess County, Illinois should be transferred to Grant County, Wisconsin. The majority opinion does so in lieu of construing Wis. Stat. § 55.06(3)(c) (2003–04),[1] which the court of appeals concluded was an unconstitutional restriction on the right to travel. While the majority opinion makes a valiant effort at trying to solve what can become problematic when a ward lives in one state and the guardian wishes to transfer the ward into Wisconsin, it does so without the benefit of legislative input or even the benefit of the court's own rulemaking. It thereby exceeds the court's constitutional powers and creates an opinion I cannot join. However, I conclude that § 55.06(3)(c) is constitutional, as applied to Jane.

[1] All further references to Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

Therefore, I, too, would reverse the court of appeals decision. However, I would affirm the circuit court's order dismissing the petition for guardianship and protective placement.

## I. BACKGROUND

¶ 62. Deborah V. petitioned the Grant County Circuit Court for the appointment of a guardian for Jane E.P. and to have her protectively placed in Grant County. Jane has been subject to guardianship and protective placement in Jo Daviess County, Illinois since 1999. She resides in a nursing home in Galena, Illinois.[2] There was no allegation that Jane is or was ever a resident of Wisconsin. There was no allegation that Jane was physically present in Wisconsin before or after the petition was filed in circuit court. The petitioner, who is her guardian and sister, is a resident of Grant County. There is nothing in the record to show that the court in Jo Daviess County appears to have exercised jurisdiction over Jane, was contacted or consulted regarding Deborah's petition.

¶ 63. In response to the petition for protective placement, the circuit court ordered Unified Community Services to make a comprehensive evaluation of Jane. After investigating Jane's location, Unified Community Services moved to dismiss because Jane was neither a resident of Grant County nor present in Grant County, as it contended that Wis. Stat. §§ 55.06(3) and 880.03 require. After an evidentiary hearing, the circuit court granted Unified Community

---

[2] The record does not contain a copy of the Illinois court order appointing Deborah as Jane's guardian, nor does it contain a copy of the terms of the Illinois protective placement. These facts are taken from the petition Deborah filed.

Services' motion and Grant County Department of Social Services (Social Services) appealed. The court of appeals reversed, concluding that § 55.06(3), as applied, unconstitutionally restricts Jane's right to travel. Unified Community Services petitioned for review and we granted its petition.

## II. DISCUSSION

### A. Concentration of Power

¶ 64. In my view, the majority opinion creates what amounts to a statute for the interstate transfer of guardianships and protective placements. While some type of an interstate compact may be helpful, that is a task that the constitution set out for the legislature. Wis. Const. art. IV, § 1. The legislature has experience in devising interstate compacts. *See* Wis. Stat. § 938.991 (interstate compact on juveniles). When it does so, it has the ability to consider and address the financial impact of the agreements Wisconsin makes with other states. § 938.991(10). The majority opinion has not evaluated the financial impact of a transfer of Jane to Wisconsin.[3]

¶ 65. Additionally, concentration of power in one branch of government in a tripartite system of government is suspect because the system was created to prevent exactly that. *See State v. Holmes,* 106 Wis. 2d 31, 42, 315 N.W.2d 703 (1982). As we have repeatedly explained, the Wisconsin Constitution envisions a separation of the legislative and judicial powers. *Id.*

---

[3] The majority opinion cites several states that it asserts have addressed out-of-state guardianships. Majority op., ¶ 26 n.11. However, in each of these states, it was the legislature that created a statute to address interstate transfers.

¶ 66. Notwithstanding our prior statements, this is the third time this term that the court has concentrated legislative and judicial power in itself. In March, as a result of a rulemaking petition, the court "repealed" the frivolous action statute, Wis. Stat. § 814.025, a substantive rule enacted by the legislature, which was not unconstitutional. Supreme Court Order No. 03–06, 2005 WI 38, ___ Wis. 2d ___. And in *State v. Jerrell C.J.,* 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110, we established parameters for police practices.

¶ 67. Here, once again, a majority of the court says it has the requisite constitutional power to establish what appears to me to be very like a statute. I dissent because I see this process that this court is becoming increasingly enchanted with as dangerous precedent. Even though the goal of the majority opinion may be a worthwhile goal, in my view, it is achieved at the expense of the balance of power set out in the Wisconsin Constitution. Unconstitutional actions taken to achieve worthwhile goals are still unconstitutional actions. Therefore, I cannot join the majority opinion. Instead, I interpret the relevant statutes and ascertain the constitutionality of Wis. Stat. § 55.06(3)(c).

B. Standard of Review

¶ 68. This case turns in part on questions of statutory interpretation to which we apply a de novo standard of review, but benefiting from the analyses of both the circuit court and the court of appeals. *See State v. Vanmanivong,* 2005 WI 41, ¶ 16, 261 Wis. 2d 202, 661 N.W.2d 76. We also decide the constitutional questions presented de novo. *See County of Kenosha v. C&S Mgmt., Inc.,* 223 Wis. 2d 373, 381–83, 588 N.W.2d 236 (1999).

## C. Statutory Interpretation

¶ 69.   Unified Community Services cites to three statutes that it asserts impact the decision about whether the Grant County Circuit Court correctly dismissed Deborah's petition:  Wis. Stat. §§ 55.06(3), 880.03 and 880.05. However, only § 55.06(3) is central to my review.

¶ 70.   When interpreting statutes, we rely on the criteria of statutory interpretation set out in *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, 271 Wis. 2d 633, 681 N.W.2d 110. In *Kalal,* we explained that our focus was to determine "statutory meaning." *Id.,* ¶ 44. We explained that:

> [j]udicial deference to the policy choices enacted into law by the legislature requires that statutory interpretation focus primarily on the language of the statute. We assume that the legislature's intent is expressed in the statutory language. Extrinsic evidence of legislative intent may become relevant to statutory interpretation in some circumstances, but is not the primary focus of inquiry. It is the enacted law, not the unenacted intent, that is binding on the public. Therefore, the purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect.

*Id.* As we have said many times, we begin with the language used in the statute and if that language is plain and clearly understood, we ordinarily stop our inquiry. *Seider v. O'Connell,* 2000 WI 76, ¶ 43, 236 Wis. 2d 211, 612 N.W.2d 659. Context is also important when determining the plain meaning of a statute, as is the purpose of the statute and its scope, if those qualities can be ascertained from the language of the statute

291

itself. *Kalal,* 271 Wis. 2d 633, ¶¶ 46–48. These are all intrinsic sources for statutory interpretation. *Id.*

¶ 71.   However, if the meaning of the statute is not plain and the statute "is capable of being understood by reasonably well-informed persons in two or more senses," then the statute is ambiguous. *Id.,* ¶ 47. When a statute is ambiguous, we often consult extrinsic "interpretive resources outside the statutory text," such as legislative history. *Id.,* ¶ 50.

¶ 72.   No one argues that the meaning of "resident" or "residence" is ambiguous. Rather, all agree that either term requires at least Jane's presence in Grant County on the date the petition was filed.

¶ 73.   In interpreting Wis. Stat. §§ 55.06(3), 880.03 and 880.05, I begin with § 880.05, which sets the statutory parameters for venue of a petition for guardianship. Section 880.05 provides:

> All petitions for guardianship of residents of the state shall be directed to the circuit court of the county of residence of the person subject to guardianship or of the county in which the person is physically present. A petition for guardianship of the person or estate of a nonresident may be directed to the circuit court of any county where the person . . . may be found.

Social Services does not contend that Jane is a resident of Grant County or that she "may be found" in Grant County.

¶ 74.   Wisconsin Stat. § 880.03 gives additional guidance for Wisconsin guardianships. It states in relevant part:

> All minors, incompetents and spendthrifts are subject to guardianship. The court may appoint a guardian of the person of anyone subject to guardianship who is also a resident of the county, or of a nonresident found

292

in the county, under extraordinary circumstances re-
quiring medical aid or the prevention of harm to his or
her person . . . .

Once again, Social Services does not contend that Jane
is a resident or may be "found" in Grant County.

¶ 75. Wisconsin Stat. § 55.06 speaks to petitions
for protective placements. It states in relevant part:

(2) The department, an agency, a guardian or any
interested person may petition the circuit court to
provide protective placement for an individual who:

(a) Has a primary need for residential care and
custody;

(b) [H]as . . . been determined to be incompetent by
a circuit court . . .

(c) As a result of . . . infirmities of aging, chronic
mental illness or other like incapacities, is so totally
incapable of providing for his or her own care or
custody as to create a substantial risk of serious harm
to oneself or others. Serious harm may be occasioned by
overt acts or acts of omission; and

(d) Has a disability which is permanent or likely to
be permanent.

(3)(a) The petition shall state with particularity
the factual basis for the allegations specified in sub.
(2).

(b) The petition under sub. (2) shall be based on
personal knowledge of the individual alleged to need
protective placement.

(c) The petition shall be filed in the county of
residence of the person to be protected.

293

(4) A petition for guardianship if required under sub. (2)(b) must be heard prior to the placement under this section.

Once again, Social Services does not contend that Grant County is Jane's "county of residence" as § 55.06(3)(c) requires. Instead, it contends that § 55.06(3)(c) is unconstitutional as applied to Jane because she is a nonresident and can never qualify in any Wisconsin county to have a petition for protective placement filed on her behalf. I will address this argument below.

¶ 76. However, before I address the constitutional argument, I note that an amicus brief filed by Legal Action of Wisconsin, Inc. asks us to interpret Wis. Stat. § 55.06(3)(c) as a venue provision. It asserts that because venue does not affect a court's power to adjudicate a given case, the court had the power to adjudicate whether a guardianship and protective placement is appropriate for Jane. Legal Action cites numerous cases to support the proposition that placing venue in the wrong Wisconsin county does not affect the authority of the court to take action.

¶ 77. Each case cited by Legal Action assumes that there is a Wisconsin county where the case could have been properly venued. Additionally, the county of residence designated in Wis. Stat. § 55.06(3)(c) is much more than the locus for hearing the petition for protective placement and guardianship. It is the county of residence that is obligated to conduct a comprehensive evaluation of the proposed ward, § 55.06(8); it is the county of residence that becomes responsible for providing the least restrictive environment consistent with the needs of the ward, § 55.06(9); and it is the county of residence that becomes financially responsible, at least in part, for whatever placement or treatment the ward

294

requires if the ward is indigent, Wis. Stat. § 51.40(1)(e) and (2), to name only a few obligations. Accordingly, I am not persuaded by Legal Action's argument that § 55.06(3)(c) is simply a venue statute.

D. Constitutionality of Wis. Stat. § 55.06(3)(c)

¶ 78. Generally, a challenged statute is presumed to be constitutional. *State v. Cole,* 2003 WI 112, ¶ 11, 264 Wis. 2d 520, 665 N.W.2d 328; *Lounge Mgmt., Ltd. v. Town of Trenton,* 219 Wis. 2d 13, 20, 580 N.W.2d 156 (1998); *State v. Konrath,* 218 Wis. 2d 290, 302, 577 N.W.2d 601 (1998). This presumption is based on our respect for a co-equal branch of government and is meant to promote due deference to legislative acts. *Cole,* 264 Wis. 2d 520, ¶ 18. "[E]very presumption must be indulged to sustain the law." *Jackson v. Benson,* 218 Wis. 2d 835, 853, 578 N.W.2d 602 (1998).

¶ 79. The court must resolve any doubt about the constitutionality of a statute in favor of upholding its constitutionality. *Monroe County Dep't of Human Servs. v. Kelli B.,* 2004 WI 48, ¶ 16, 271 Wis. 2d 51, 678 N.W.2d 831; *Cole,* 264 Wis. 2d 520, ¶ 11. Further, " '[g]iven a choice of reasonable interpretations of a statute, this court must select the construction which results in constitutionality.' " *American Family Mut. Ins. Co. v. DOR,* 222 Wis. 2d 650, 667, 586 N.W.2d 872 (1998) (quoting *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 526, 261 N.W.2d 434 (1978)).

¶ 80. A party challenging a statute's constitutionality bears a heavy burden to overcome the presumption of constitutionality. *Dowhower v. West Bend Mut. Ins. Co.,* 2000 WI 73, ¶ 10, 236 Wis. 2d 113, 613 N.W.2d 557. Therefore, it is insufficient for the party challenging the statute to establish either that the statute's

constitutionality is doubtful or that the statute is probably unconstitutional. *Cole,* 264 Wis. 2d 520, ¶ 11; *Jackson,* 218 Wis. 2d at 853. Instead, a party challenging a statute's constitutionality must demonstrate that the statute is unconstitutional beyond a reasonable doubt. *Cole,* 264 Wis. 2d 520, ¶ 11; *Jackson,* 218 Wis. 2d at 853; *Konrath,* 218 Wis. 2d at 302. While this language implies the evidentiary burden of proof most commonly used for factual determinations in a criminal case, in this context, the phrase, "beyond a reasonable doubt," establishes the force or conviction with which a court must conclude, as a matter of law, that a statute is unconstitutional before the statute or its application can be set aside. *See Guzman v. St. Francis Hosp., Inc.,* 2001 WI App 21, ¶ 4 n.3, 240 Wis. 2d 559, 623 N.W.2d 776.

¶ 81. In order to examine the constitutionality of Wis. Stat. § 55.06(3)(c) and its claimed effect on Jane's constitutional right to interstate travel, we first must determine what type of right is at issue. The right to interstate travel is a federal constitutional right that has no explicit mention in the United States Constitution. *Shapiro v. Thompson,* 394 U.S. 618, 630 (1969).

¶ 82. States have imposed residency requirements that burden the right to travel. If those requirements do not implicate a "suspect" classification, the state need show only that there is a rational basis for the residency requirement. *See Martinez v. Bynum,* 461 U.S. 321, 328 n.7 (1983). However, if the requirement implicates a suspect classification, the state must show that its regulation is "necessary to promote a *compelling* governmental interest." *Shapiro,* 394 U.S. at 633–34. The residency requirement at issue here does not impact on any suspect classification of residents. All are treated the same, no matter who they are or whence

they came. The definition of Wis. Stat. § 49.001(6) is applied to all petitions for protective placements and guardianships. Wis. Stat. § 55.06(8). Section 49.001(6) provides: " 'Residence' means the voluntary concurrence of physical presence with intent to remain in a place of fixed habitation. Physical presence is prima facie evidence of intent to remain."

¶ 83. There are two general types of residency requirements: durational requirements and bona fide requirements. *Martinez,* 461 U.S. at 325. A durational residency requirement limits the rights or services that are available to new residents of the state when compared with those residents who have been residents for a stated period of time. A bona fide residency requirement "simply requires that the person *does* establish residence before demanding the services that are restricted to residents." *Id.* at 329.

¶ 84. Bona fide residency requirements have often been upheld. *See id.* (upholding a residency requirement necessary to obtaining free public education); *Dunn v. Blumstein,* 405 U.S. 330, 343–44 (1972) (concluding that states may require "that voters be bona fide residents of the relevant political subdivision[s]" in order to be entitled to vote). Because it does not matter how brief a time the proposed ward is a resident of a Wisconsin county before a petition for protective placement is filed, the requirement of Wis. Stat. § 55.06(3)(c) is a bona fide residency requirement.

¶ 85. The next question we must ask is to what extent does the residency requirement interfere with the right to interstate travel. Here, Wis. Stat. § 55.06(3) does not prevent Jane's travel to Wisconsin. She is free to come to her sister's home in Grant County. It may be that the Illinois guardianship and protective placement

restrict her ability to leave Illinois, but the record gives no information in that regard.

¶ 86.   If we were to assume, arguendo, that the residency requirement does burden Jane's right to interstate travel, the State may do so if the State has a rational basis for the residency requirement. *Martinez,* 461 U.S. at 328 n.7. Here, the record is full of testimony about the financial effect a protective placement has for the county of residence and for the state. There was testimony that state and county resources are so limited that current residents are not being provided with the services they have requested. Neal Blackburn, the representative from Unified Community Services, was asked whether there was a waiting list of Wisconsin residents who had requested services that could not be provided due to a shortage of funds and he responded, "We have approximately close to 60 on the waiting list and that number grows every day or every month." Blackburn was also asked whether Unified Community Services had sought more money from the State. He said it had, but none was forthcoming, and instead he had been told that there would be a "significant cut in state funding," due to the budget deficit. The testimony shows that the residency requirement is rationally related to protecting and preserving the county's and the State's ability to provide services to its own bona fide residents in preference to those persons who reside in other states.

¶ 87.   In holding Wis. Stat. § 55.06(3)(c) unconstitutional, the court of appeals concluded that the only way Jane could come to Wisconsin is if a Wisconsin court were to place her here. This, the court concluded, was a restriction on her right to travel. There is nothing in the record to support this conclusion. Perhaps it is the order of the Illinois court that keeps her in Illinois.

However, aside from being told that she was found to be incompetent in Illinois and that she is the subject of an Illinois guardianship and protective placement, we know nothing of the terms of the Illinois court's order. Additionally, without identifying a "suspect classification" that was impacted negatively by § 55.06(3)(c), the court of appeals concluded that the State had not shown a "compelling governmental interest" in restricting Jane's right to travel. In so doing, it applied the wrong test. *See Martinez,* 461 U.S. at 328 n.7. Here, the State need show only that it has a rational basis for the residency requirement. *Id.* It has done so. Accordingly, for all the reasons set out above, I conclude that § 55.06(3)(c) passes constitutional muster.

## III. CONCLUSION

¶ 88.   I conclude that this court does not have the constitutional power it exercises in the majority opinion and that Wis. Stat. § 55.06(3)(c) is constitutional, as applied to Jane. Therefore, I would reverse the court of appeals decision. However, I would affirm the circuit court's order dismissing the petition for guardianship and protective placement.

¶ 89.   Accordingly, I respectfully concur in part and dissent in part from the majority opinion.

¶ 90.   I am authorized to state that Justice JON P. WILCOX joins this concurrence and dissent. I am also authorized to state that Justice N. PATRICK CROOKS joins Section D of this concurrence and dissent.