In the MATTER OF THE GUARDIANSHIP AND PROTECTIVE PLACEMENT OF CATHERINE P., Incompetent:

LINDA L., Guardian of the Person of Catherine P., Appellant-Cross-Respondent,

v.

James COLLIS, Guardian ad Litem of Catherine P., Respondent,

WAYNE P., Interested Person, Respondent-Cross-Appellant.

Court of Appeals

No. 2005AP494. *Oral argument March 7, 2006.* —*Decided May 31, 2006.*

2006 WI App 105

(Also reported in 718 N.W.2d 205.)

639

On behalf of the appellant-cross-respondent, the cause was submitted on the briefs of and oral argument by *Patricia M. Cavey*, of Milwaukee.

On behalf of the respondent, the cause was submitted on the joint brief of *Richard H. Hart* of *Hart Law Office*, of Milwaukee, and *James E. Collis* of *James E. Collis, J.D.*, Ltd., of Milwaukee. There was oral argument by *Richard H. Hart*.

On behalf of the respondent-cross-appellant, the cause was submitted on the brief of *Franklyn M. Gimbel, Denis J. Regan* and *Kathryn A. Keppel* of *Gimbel, Reilly, Guerin Brown*, of Milwaukee. There was oral argument by *Franklyn M. Gimbel*.

A brief was filed by the guardian ad litem of *Catherine P.* and oral argument by *Patricia D. Jursik* of *Jursik & Jursik,* of Cudahy.

Before Fine, Curley and Kessler, JJ.

¶ 1. KESSLER, J. Linda L. ("Linda") appeals from a final order, entered on April 18, 2005, removing her as guardian of the person for her mother, Catherine P. ("Catherine"), and ordering that Catherine be transferred back to Wisconsin from Connecticut, where Linda moved her in December 2004. Linda also seeks review of parts of non-final orders entered in January and on February 18, 2005, that led to the final order. We affirm.

¶ 2. Linda's brother, Wayne P. ("Wayne"), an interested party, cross-appeals from the circuit court's ruling that Linda had legal authority to change Catherine's domicile to another state without prior court approval. We agree with Wayne that Linda lacked such authority. Thus, we affirm on this ground, as opposed to the circuit court's stated ground, the circuit court's order finding that the transfer should not have occurred.

## BACKGROUND

¶ 3. In May 2002, Linda, a resident of Connecticut, filed a petition to become permanent guardian of Catherine's person and estate, alleging that her mother was suffering from infirmities of aging that rendered her incompetent. Attorney James E. Collis was appointed temporary guardian ad litem for Catherine. The circuit court found Catherine to be incompetent. It does not appear that Catherine's inability to care for herself or to manage her property was seriously disputed. In November 2003, the circuit court issued an order, pending the final appointment of a guardian of the person and of the estate, indicating that neither Catherine nor her assets could leave or be removed from the State of Wisconsin.

¶ 4. Wayne objected to having Linda appointed guardian of Catherine's person and estate. After extensive proceedings, the circuit court in February 2003 appointed Linda guardian of the person, and attorney Leonard Brady as guardian of the estate, which was valued at slightly over one million dollars.

¶ 5. It was further ordered that Catherine would reside some months of the year in Florida, some months in Connecticut, and some months in her Milwaukee home. Linda and Wayne were assigned specific months to live with Catherine. Both siblings were to have "free

641

and open access" to Catherine when she was residing with the other sibling, including "phone contact, personal visits, letters, e-mails and faxes."

¶ 6. It is not clear from the record whether the placement schedule set forth in the February 2003 order was actually implemented. However, on October 25, 2003, Catherine, who was living in her Milwaukee home, was hospitalized after her health deteriorated. On November 8, 2003, she was discharged to a nursing home, Heritage Square. Linda filed a petition for protective placement. A comprehensive evaluation revealed that Catherine suffered from a variety of ailments, including hypertension, hypothyroidism, osteoarthritis, senile dementia with delirium, general deconditioning and others. The circuit court granted the petition on May 19, 2004, finding that Catherine was "totally incapable of providing for her own care or custody" and that the least restrictive environment consistent with Catherine's needs was an unlocked unit in a nursing home in Wisconsin.[1]

¶ 7. Catherine remained at Heritage Square. In September 2004, one of her doctors reported that he believed Catherine was doing very well and might be able to live in a less restrictive environment. On November 2, 2004, in anticipation of a court hearing, Catherine's guardian ad litem, Collis, suggested in a letter to the circuit court and the parties that other placement alternatives be explored. Collis also suggested that if Linda and Wayne could not agree on a less restrictive placement consistent with Catherine's needs, adversary counsel should be appointed.

---

[1] The proceedings through May 2004 were heard by the Hon. Thomas R. Cooper. Due to judicial rotation, the case was later assigned to the Hon. M. Joseph Donald, who presided over the subsequent proceedings, except as noted in this decision.

¶ 8. The parties appeared before the circuit court on November 4, 2004, to discuss moving Catherine to a less restrictive environment.[2] On December 10, 2004, the circuit court ordered that Catherine undergo a psychological examination to determine the least restrictive placement consistent with her needs. The circuit court also appointed Attorney Richard Hart as Catherine's adversary counsel, although he was not provided with the appointment order until January 25, 2005, and did not accept the appointment until January 27, 2005.

¶ 9. While the circuit court order for a new evaluation of Catherine was in effect, on December 21, 2004, without advance notice to the circuit court, guardian ad litem, adversary counsel or Wayne, Linda removed Catherine from Heritage Square, and placed her in a nursing home in Connecticut. On December 23, 2004, Linda began a conservatorship proceeding in Connecticut, claiming that Catherine was now domiciled in Connecticut.[3] Linda sought to be named conservator of Catherine's person and estate. In her affidavit, Linda asserted that she had "been advised by counsel that as Guardian of the Person, I have legal authority to make placement decisions for my mother and ward" and had "exercised such authority to place my mother" in Connecticut. She also stated:

> As to the decision to place my mother in Connecticut, [the Connecticut facility] not only provides skilled facilities that are comparable to the skilled nursing facility of which she was a resident in Wisconsin but, in addition, we now have the option of a less restrictive environment for my mother. A copy of a letter [from

---

[2] The guardian ad litem was not present, but was excused.

[3] The equivalent of a WIS. STAT. ch. 880 guardianship is known as a conservatorship in Connecticut.

Catherine's Wisconsin doctor], dated September 10, 2004 and addressed to the Court in Wisconsin, stating that she can be in a less restrictive environment, is attached . . . .

Linda also asserted that the guardian of Catherine's estate had failed to pay nursing home bills and medication bills on time, and that this failure had created a "necessity to immediately remove Attorney Leonard Brady as Conservator of my mother's estate and appoint a new Conservator[.]"

¶ 10. Meanwhile, in Wisconsin, Wayne attempted to visit his mother at Heritage Square on December 21 and 23, 2004. He was informed on December 23 that she was no longer a resident.

¶ 11. On December 30, 2004, Collis filed a petition, pursuant to WIS. STAT. § 55.06(9)(b) (2003–04),[4] to

---

[4] WISCONSIN STAT. § 55.06(9)(b) provides:

Transfer may be made between placement units or from a placement unit to a medical facility other than those specified in pars. (c) to (e) by a guardian or placement facility without approval by a court. When transfer is made by a placement facility, 24 hours' prior written notice of the transfer shall be provided to the guardian, when feasible. If it is not feasible to notify the guardian in advance, written notice shall be provided immediately upon transfer, and notice shall also be provided to the court and to the board designated under s. 55.02 or an agency designated by it within a reasonable time, not to exceed 48 hours from the time of the transfer. Upon petition to a court by a guardian, ward, or attorney, or other interested person specifying objections to a transfer, or if the person is transferred to an intermediate facility or to a nursing facility, the court shall order a hearing, within 96 hours after filing of the petition, to determine whether there is probable cause to believe that the transfer is consistent with the requirements specified in par. (a) and is necessary for the best interests of the ward or, if the person is transferred to an intermediate facility or to a nursing facility, to determine if the intermediate facility or nursing facility is the most integrated setting, as defined in s. 46.279 (1) (bm), that is appropriate to the

review the transfer of placement. In an accompanying affidavit, Collis stated that he was officially notified of the transfer of placement on December 27, 2004, when he was provided with a copy of the December 23, 2004 motion for conservatorship. He asserted that he had not been consulted about the transfer, and was not aware of the nature of the facility to which Catherine had been moved.

¶ 12. A hearing on Collis's motion to review the transfer was set for January 3, 2005. Because the hearing had to be held within ninety-six hours of the petition, *see* WIS. STAT. § 55.06(9)(b), and the Hon. M. Joseph Donald was not available, the Hon. Kitty K. Brennan presided over the hearing.

¶ 13. On the day of the hearing, Linda filed a response to Collis's motion to review the transfer, asserting that as a result of a December 28, 2004 hearing in Connecticut, the Connecticut court now had jurisdiction over Catherine, and stating that the Connecticut court had appointed Linda temporary guardian/conservator of Catherine. Linda asserted that she had the right to change Catherine's domicile, and that any concerns anyone had should now be addressed by the Connecticut court. She also noted that a guard-

---

needs of the ward taking into account information presented by all affected parties. The court shall notify the ward, guardian, and petitioner of the time and place of the hearing, and a guardian ad litem shall be appointed to represent the ward. If the person is an adult who is indigent, the county of legal settlement shall be liable for guardian ad litem fees. If the person is a child, the person's parents or the county of legal settlement shall be liable for guardian ad litem fees as provided in s. 48.235 (8). The petitioner, ward, and guardian shall have the right to attend, and to present and cross-examine witnesses.

All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

645

ian ad litem/adversary counsel had been appointed for Catherine in Connecticut, and that a permanent hearing on the petition for conservatorship was scheduled for January 25, 2005. Linda sought dismissal of Collis's objection to the transfer.

¶ 14. Linda was not present at the January 3, 2005 hearing, but attorney Patricia Cavey appeared on her behalf. The circuit court first heard argument on Linda's jurisdictional objection. Cavey questioned whether a guardian ad litem has statutory authority to seek review of a transfer under Wis. Stat. § 55.06(9)(b). She also argued that even if a guardian ad litem can seek review, in this case the Connecticut court should provide that review. She explained that because Linda had authority to move Catherine without prior court approval, and Catherine now lived in Connecticut, the Connecticut court should decide whether Catherine should remain in Connecticut.

¶ 15. The circuit court rejected Cavey's arguments, concluding that Collis as guardian ad litem was entitled to seek review of the transfer under Wis. Stat. § 55.06(9)(b), and that the Wisconsin court had jurisdiction to consider the petition for review.

¶ 16. When asked for his opinion on a proper procedure, Collis stated that the nursing home in Connecticut was probably very good, but he questioned whether moving Catherine to Connecticut was necessary for Catherine's best interest, as required by Wis. Stat. § 55.06(9)(b). Collis also stated that he did not believe it would be appropriate to immediately return Catherine to Wisconsin, because it is not in Catherine's best interest "to be moving back and forth between the two venues . . . ."

¶ 17. The circuit court concluded that it would be best to continue the hearing before Judge Donald, on a

date to be determined, and that Catherine should remain in Connecticut until that hearing took place. The circuit court also ordered that Collis arrange for a doctor in Connecticut to evaluate Catherine and the facility. The circuit court directed Collis to prepare an order consistent with the circuit court's decision.

¶ 18. The circuit court signed Collis's proposed findings and order. Of particular relevance are specific findings that: (1) Linda, as guardian of the person, had legal authority to transfer Catherine without prior court approval; (2) Linda effected the transfer of Catherine without prior notice to interested persons; and (3) Linda had the burden to prove that there was probable cause that the transfer was consistent with the requirements of WIS. STAT. § 55.06(9)(a) and that the transfer of placement was necessary for Catherine's best interest.

¶ 19. On January 13, 2005, the parties appeared before Judge Donald.[5] The circuit court conducted the placement review hearing authorized by WIS. STAT. § 55.06(9)(b) to determine whether there was "probable cause to believe that the transfer is consistent with the requirements specified in [§ 55.06(9)(a)] and is necessary for the best interests of the ward." *See* § 55.06(9)(b). Again, Linda did not appear; but Cavey appeared on her behalf.

¶ 20. The only witness who testified was Marianne Ewig, a geriatric social worker who owned a geriatric management firm and had been retained by Cavey. Ewig testified about the differences between the

---

[5] The January 13, 2005 date appears to be a date that was previously scheduled to discuss the sale of some of Catherine's real estate. That real estate is not at issue in this appeal and, therefore, the parties' discussion of that issue will not be addressed here.

647

facility in Wisconsin from which Catherine had been removed and the Connecticut facility to which she had been transferred. Essentially, she described the Milwaukee facility as a skilled nursing facility, and the Connecticut facility as an assisted living facility with a program for the memory-impaired. She described the Connecticut facility as being unique in the way the rooms are laid out, with a living room, bathroom and a bedroom off each side of the living room. Ewig expressed the opinion that the Connecticut facility was a less restrictive placement than the prior Milwaukee facility and was consistent with Catherine's needs.

¶ 21. Ewig provided other general information to the circuit court. She discussed the type of preparation that needed to be done before moving a dementia patient from one facility to another. These included

> [i]nterviews with the family and significant others, a look at the geography, relationship of a family member to the potential recommended facility, a review of facilities in terms of the level of care available. When it comes to dementia specifically, whether that facility has consulted or trained with the Alzheimer's association for the development of their criteria, looking for [an] environment that is safe and provides the social stimulation and activities appropriate for the person's mental capacity.

Ewig also noted that one of the "best practices" in the field of social work prior to moving a dementia patient is

> [p]reparation of the family, preparation of the facility from which the person is being discharged, preparation for the facility to receive the patient and follow through on that placement.

¶ 22. Ewig, who met with Catherine in Connecticut, said that Catherine said she feels "like a stranger in a strange land" and that she needed company, suggesting she would like a roommate.

¶ 23. Ewig acknowledged that during her professional career she has visited over one hundred and fifty assisted living facilities in southeast Wisconsin. When Ewig was asked to identify the advantages to Catherine of the Connecticut placement other than being close to Linda, Ewig mentioned only the unique physical layout of the Connecticut facility. Although she testified that there were no other places like the Connecticut facility in Wisconsin, she admitted on cross-examination that there are facilities of similar quality in Wisconsin that would meet Catherine's needs.

¶ 24. Ewig agreed that the guardian ad litem and the guardian of the estate would not have easy access to Catherine in Connecticut. She acknowledged that it would not be a negative for a person with dementia to have friends and family visit, and that she knew nothing about visits to Catherine in Milwaukee by Wayne or other extended family or friends. She also said that she had not spoken to either of Catherine's doctors nor to any of Catherine's family or friends other than Linda and Linda's husband. Ewig agreed that her testimony was limited to the question of whether the Connecticut facility was appropriate for Catherine and less restrictive than the Wisconsin facility.

¶ 25. The circuit court requested and accepted offers of proof from other witnesses. Attorney Cavey indicated that the director of Heritage Square would testify that the staff had concerns about allowing Catherine to have off-site visits with Wayne and Wayne's wife. Wayne's counsel, Franklyn Gimbel, indicated that Catherine's niece, a cousin of Catherine who

is a nun, a family friend and Wayne would all testify about their regular visits to Catherine and how she enjoyed the interaction.

¶ 26. The circuit court then asked for the parties' positions. Collis argued that Linda had failed to establish probable cause that the transfer to the Connecticut facility was necessary for Catherine's best interests. In contrast, Cavey argued that because of inappropriate behavior on the part of Wayne[6] and other family members, moving Catherine to Connecticut, without prior notice to anyone, was "absolutely pursuant to the statute" and "absolutely necessary" under the circumstances.

¶ 27. Gimbel argued, on behalf of Wayne, that Linda had failed to establish that the transfer was necessary for Catherine's best interests. He urged the circuit court not to reward Linda for removing Catherine from the state. He also argued that Catherine would benefit from continued interaction with her friends and family in Milwaukee.

¶ 28. Prior to making its ruling, the circuit court asked for confirmation that neither Linda nor Cavey had told anyone about the proposed move out of state. Cavey confirmed that the move was being planned prior to December 21, 2004, and that no one was informed. She said that she and Linda had wanted to tell Collis,

---

[6] The Dissent details allegations against Wayne concerning his behavior at the nursing home and otherwise. *See* Dissent, ¶¶ 95–97. This case is not about whether Wayne or Linda is a more appropriate guardian. Wayne is not seeking appointment as Catherine's guardian. Wayne's past behavior, which we do not condone and which is not a part of this appeal, was addressed by the circuit court through orders to return property and orders that appointed others to serve as guardians of Catherine's person and estate.

650

but were concerned that he would share this information with Wayne. She stated: "[I]t is absolutely our position that it was absolutely necessary to do this without the consent of Wayne and [his wife]."

¶ 29. The circuit court recognized that pursuant to WIS. STAT. § 55.06(9)(b), it had to determine whether there was "probable cause to believe that the transfer is consistent with the requirements specified in [§ 55.06(9)(a)] and is necessary for the best interests of the ward." *See* § 55.06(9)(b). It found probable cause that the § 55.06(9)(a) requirements were satisfied, in part because the new facility provided a less restrictive environment, which had been contemplated by all parties since Catherine's doctor recommended that in September 2004.

¶ 30. However, the circuit court found that Linda had not established probable cause that the transfer was necessary for Catherine's best interest. The circuit court explicitly found incredible the social worker's testimony that there was no other facility in all of southeastern Wisconsin that would as appropriately provide for Catherine's needs as the facility in Connecticut.

¶ 31. Having found that there was not probable cause that the transfer was necessary for Catherine's best interest, the circuit court next considered how to address the fact that Catherine was still in Connecticut. The circuit court noted that it did not want to inflict trauma on Catherine by immediately ordering her back. The circuit court ordered that there be an independent evaluation of whether she should be returned to Wisconsin. The circuit court's signed order explicitly adopted the findings and order of Judge Brennan as its own, and reflected its oral ruling that there was no

probable cause to believe that the move to Connecticut was necessary for Catherine's best interest.

¶ 32. On January 26, 2005, Wayne moved for the removal of Linda as guardian of the person. The motion indicated that a hearing had been scheduled before Judge Donald for February 4, 2005. On January 28, 2005, Cavey wrote to the circuit court, stating:

> On Thursday, January 27, 2005 my office received correspondence from Attorney Gimbel indicating that he had scheduled a motion hearing on your calendar for February 4, 2005. Mr. Gimbel had not made a courtesy call to me prior to scheduling this matter. I have a conflict on February 4th with another matter in litigation in Madison.

> I will file a response to Mr. Gimbel's motion asking for dismissal since he failed to state grounds for the removal of a guardian. The items in his affidavit, other than his statement that he is new to the case, have already been adjudicated and re-litigation is precluded.

Cavey did not explicitly ask for an adjournment of the February 4, 2005, hearing, or send another attorney to the hearing in her place.

¶ 33. On January 31, 2005, Gimbel wrote to the circuit court, explaining that he quickly filed and noticed the motion to remove Linda as guardian of the person "because Linda [] and her attorneys in Wisconsin and Connecticut continue to aggressively push for her appointment as conservator of the person and the estate in Connecticut, despite your recent rulings." Gimbel also contended that, contrary to Linda's assertions, there were new bases to argue for Linda's removal: the secretive move to Connecticut and her attempts to disrupt Catherine's relationship with Wayne.

¶ 34. On February 4, 2005, the parties appeared before the circuit court on Wayne's motion to remove

Linda as guardian of Catherine's person. Neither Linda nor Cavey appeared. The circuit court noted that the parties had spoken in chambers, and that the matter was going to be continued to another day so that Cavey could appear and represent Linda's interests. The circuit court stated:

> [T]here is a letter in the court file from Miss Cavey which indicates that . . . [b]ased on a conflict, that she would not be able to appear in this matter, and therefore, it makes it somewhat difficult for this Court to proceed on the motion to remove the Guardian of the Person . . . .

The circuit court identified its concerns with respect to continued proceedings in Connecticut:

> [T]he other matter that is somewhat troubling to the court is the ongoing proceedings that are taking place in Connecticut, and in light of the motion that Mr. Gimbel has filed [to remove Linda], and in light of the fact that Miss Cavey is not here today to voice any opposition, this Court . . . consistent with the findings that were previously made and the testimony that was previously received in the record, I am going to . . . issue an order restricting the powers of [Linda] until this Court can make the ultimate determination as to whether or not I'm, one, going to bring [Catherine] back, and secondly . . . remove [Linda] as the Guardian of the Person in this matter. My belief and rationale for doing this today is to ensure that the status quo is maintained and that . . . there aren't any other issues that are unnecessarily created by [Linda], in terms of trying to undermine this Court's authority or jurisdiction in this matter.

The circuit court ordered that Linda's authority would, on a temporary basis, be restricted to making medical decisions for Catherine, and that all other decisions

would have to be made in conjunction with and with the approval of Collis.

¶ 35. On February 14, 2005, Catherine's adversary counsel, Hart, filed a motion to suspend Linda as guardian of the person. The motion also asked that Linda be held in contempt and sought sanctions against her. In support of the motion, Hart filed an affidavit describing difficulties he had meeting with his client in Connecticut. He claimed Linda interfered with his efforts to meet with Catherine.

¶ 36. On February 15, 2005, Linda filed an answer and motion to dismiss Wayne's motion to remove Linda as guardian of the person. She argued that Wayne's attorney lacked standing to file a verified petition because he was not an "interested person" or "interested party" under WIS. STAT. chs. 55 or 880. She explained: "The circuit court does not acquire competency to proceed without a petition verified by one with standing, served in compliance with Wis. Stat. §§ 879.01, 879.03, 879.05" and, therefore, "[a] motion mailed under the 'five day rule' of Wis. Stat. § 801.15(4) is defective to confer competency to proceed." She also complained about the fact that the February 4, 2005, hearing occurred even though her attorney was not available, and noted that as of February 13, "multiple proposed orders have been submitted as to what supposedly occurred, but no order has been entered."

¶ 37. On February 18, 2005, Cavey filed, on Linda's behalf, objections to the proposed order prepared by Wayne's attorney and an answer to adversary counsel's affidavit. Attorney Cavey stated:

> Because I was not at the February 4th proceeding . . . and there was no signed order served setting either the February 4th hearing or the February 18th hearing, the Answers to the two motions to remove . . .

654

[Linda] have raised the issue of the court's competency to proceed in light of non-compliance with Wis. Stat. §§ 879.01, 879.03, 879.05. Unfortunately, Wis. Stat. § 879.11 provides that if I appear at the improperly noticed proceeding, I waive the objection. Since I do not waive the objection to counsels' failure to comply with Wis. Stat. §§ 879.01, 879.03 and 879.05, I cannot appear on February 18th.

With as much heat and as little light as the blizzard of letters and affidavits from various lawyers has generated, I request that you order the parties to brief the following issues:

> 1. the extra-territorial effect of a Wisconsin guardianship proceeding;

> 2. whether you still adopt Judge Brennan's ruling that [Linda] had authority to transfer Catherine P. without obtaining approval (the nature of this ruling has been misrepresented in Connecticut . . .);

> 3. whether the court acquires competency to proceed on disputed facts regarding removal of a guardian without compliance with Wis. Stat. §§ 879.01, 879.03, 879.05.

I believe that a real motion hearing that addresses whether the pleadings state a claim for removal, not a quasi-status conference, should be scheduled after the briefs are filed. If factual disputes remain after the legal issues are addressed, I request that you set a scheduling conference for a scheduling order on discovery, witness disclosure, and trial.

Finally, I want to reiterate my standing objection to proceedings being conducted in my absence and to attorneys discussing the case with the court outside my presence whether that discussion occurs "in chambers," on the record or in correspondence to the court where I am not copied.

655

¶ 38. Also on February 18, 2005, Linda filed with the Court of Appeals a thirty-five-page petition for leave to appeal a non-final order (*i.e.,* the February 4, 2005 order) that sought a stay of the guardian removal proceedings scheduled for that day. One hundred and twenty-nine pages of exhibits were included. The Court of Appeals denied Linda's motion the same day, stating: "Based on the ongoing fact-finding at the trial court, we conclude that a stay is not necessary at this time."

¶ 39. On February 18, 2005, the parties appeared for the continued hearing on Wayne's motion to remove Linda as guardian of the person. Neither Linda nor her attorney appeared. The circuit court heard testimony from Miriam Oliensis-Torres, who conducted an independent evaluation of whether returning Catherine to Wisconsin would be in her best interest. Torres reported that she met with both Linda and Wayne and their spouses, Linda's Wisconsin and Connecticut attorneys, guardian ad litem/adversary counsel appointed in the Connecticut case and spoke by telephone with the program director at the Connecticut facility. Torres reviewed Wisconsin medical records, but did not have an opportunity to review the Connecticut records, spoke with staff at the Connecticut nursing home, and talked privately with Catherine, in person, in Connecticut.

¶ 40. Torres reported that initially Linda said she would permit Torres to conduct the interview only if Linda and her husband were present, but she was ultimately able to interview Catherine privately. However, while Torres was present in Connecticut, Linda would not allow Hart to talk with Catherine by telephone with Torres facilitating the calls. Torres expressed her opinion that Linda was trying to control and orchestrate the circumstances under which Torres could inter-

view Catherine even though the circuit court had ordered the evaluation.

¶ 41. Torres reported Catherine's conversation with her. Catherine told Torres that she liked where she was; that it was "quiet, nice," that Connecticut was "taking some getting used to," and that where she wanted to be was "that other place," which Torres thought meant Florida where she previously had a vacation home, or Port Washington where Catherine grew up. Catherine denied having family in Wisconsin, indicating "they're all gone" and did not recognize a fairly recent photo of Wayne.

¶ 42. Torres testified that there are facilities in Wisconsin that will meet Catherine's needs just as well as the facility in Connecticut. Torres concluded that Catherine is flexible, adapted easily to Connecticut and would "likely be able to make a rapid, smooth adjustment" if moved again.

¶ 43. In Torres's opinion, Catherine had been "greatly impacted by the conflict between the family members in the battling that's taking place." Torres explained: "I see the battling . . . as the primary factor that is negatively impacting on her ability to have her needs met, either in Wisconsin or Connecticut." Torres reported Linda as saying, with regard to Catherine, "I worked very hard to get her well. I be damn [sic] if I let someone take her from me." Torres said the conflict between Linda and Wayne was so serious, with such animosity, that she did not see how either Linda or Wayne could be guardian and have the other one be supportive. She recommended that a non-family-member guardian of the person be appointed.

¶ 44. Wayne's counsel relied on Torres's testimony in support of his argument that Linda should be removed as guardian of the person. He argued that Linda

should be removed because "her recent conduct has shown that she is no longer capable of acting in the best interest of Catherine . . . ." Counsel contended that Linda's decision to move Catherine without notice to anyone and Linda's systematic attempt to block Wayne's access to Catherine were evidence that Linda was not acting in Catherine's best interest. He also argued that the existing conflict between Linda and Wayne required the appointment of an independent guardian.

¶ 45. In response to a question by the circuit court, counsel also asserted that the motion to remove Linda as guardian of the person was properly before the circuit court.

¶ 46. Hart noted that he had served his own motion to suspend Linda as guardian of the person, and that Linda's counsel had not responded in any way except to e-mail him and inquire how and when he was appointed Catherine's adversary counsel. Hart argued that Linda's failure to appear in person or by counsel was a basis to strike all of Linda's pleadings.

¶ 47. The circuit court concluded that it should remove Linda as guardian of the person. It explained:

> It appears to me based on the testimony that I have received, the affidavits and the filings, that [Linda] has, in essence, put her own self-interests above that of her ward such that it becomes a matter of what she feels is best regardless of what the Court orders or what the Court has ordered that she do in this matter, at least cooperate and assist the Court in obtaining information . . . . Essentially, what I'm trying to do is get enough information to make the determination as to whether or not it is appropriate to bring [Catherine] back to Wisconsin.
>
> Given the behavior of [Linda] in ignoring court orders, frustrating the process, imposing herself unnecessarily in the process, and I'm also somewhat frus

trated by the nonappearance of Miss Cavey in these matters in terms of filings made, but yet not appearing in court to either address the Court's concerns with respect to the filings or answering questions or even making arguments on them. So at this time, I'm satisfied that there is good cause to remove Linda . . . as the Guardian of the person . . . .

The circuit court then appointed Collis to serve as guardian of the person, and Hart to be the guardian ad litem.[7]

¶ 48. On February 21, 2005, Linda filed a notice of appeal from the February 18, 2005 order removing Linda as guardian of the person, and sought a stay of the order pending appeal.

¶ 49. On March 4, 2005, Linda moved the circuit court to vacate its February 18, 2005 orders or, in the alternative, to stay them. These orders removed Linda as guardian of the person and ordered that adversary counsel have access to Catherine's medical records. Linda included numerous affidavits in support of her motion. Hart filed a brief opposing the motion. A hearing was scheduled for March 11, 2005.

¶ 50. All counsel and Wayne appeared before the circuit court on March 11, 2005, for a hearing on Linda's motion, although again Linda did not appear in person. Cavey presented the following arguments in favor of vacating the order removing Linda as guardian of the person: (1) the February 18, 2005 hearing should not have been held because the order setting the hearing for that date was not signed by the circuit court until February 18, and there was insufficient time to

---

[7] Linda subsequently pointed out that such transfers of roles were prohibited and the circuit court agreed. The circuit court asked Hart to remain in his role as adversary counsel and appointed a new guardian ad litem, attorney Patricia D. Jursik.

prepare; (2) Linda had a valid reason for not wanting to appear in person or through counsel on February 18: she did not want to waive her objection to the lack of a valid petition to remove her; and (3) Linda, who was carefully selected by Catherine to be her power of attorney, should not be removed based on only limited testimony.

¶ 51. The circuit court heard argument from the parties and denied Linda's motion to vacate the prior orders, with the exception that it assigned a new guardian ad litem and retained Hart as adversary counsel. Collis was ordered to continue as successor guardian.

¶ 52. The circuit court asked Cavey whether she was prepared to address whether Catherine should be returned to Wisconsin, and she indicated that she would prefer to see Collis's recommendation in writing and hold another hearing. The circuit court agreed with this approach and set a hearing for April 7, 2005.

¶ 53. In a detailed written report, Collis recommended that Catherine be returned to Wisconsin. After hearing from the parties, the circuit court granted the motion.[8] This appeal followed.

---

[8] Linda's arguments on appeal center on whether she had the authority to move Catherine without prior notice, and whether she should be removed as guardian of the person. She does not contend that the evidence was insufficient to justify returning Catherine to Wisconsin. Therefore, we do not provide detail on the evidence that supports the circuit court's decision, and we do not review the decision to return Catherine to Wisconsin.

Although the details are not in the record, the parties disclosed at oral argument that, consistent with the circuit court's order, Catherine was returned to Wisconsin and is now living in a facility in the Milwaukee area.

660

## DISCUSSION

¶ 54. Linda identifies seven issues that she maintains are relevant to her appeal of the circuit court's orders that: (1) found that moving Catherine to Connecticut was not necessary for Catherine's best interest; and (2) removed Linda as Catherine's guardian of the person. We examine Linda's issues in the course of discussing the circuit court's orders.

¶ 55. We begin, however, with our discussion of the legal issue raised in Wayne's cross-appeal, because it affects our analysis of Linda's issues. Wayne contends that under Wisconsin law, a guardian of the person cannot transfer a ward outside the state without prior court approval.

### A. Guardian of the person's authority to transfer Ward's domicile

¶ 56. Whether a guardian has authority, pursuant to WIS. STAT. § 55.06(9)(b), to transfer a ward to an out-of-state facility requires statutory interpretation, which is an issue of law we review *de novo*. *State v. Stenklyft*, 2005 WI 71, ¶ 7, 281 Wis. 2d 484, 697 N.W.2d 769. We begin with § 55.06(9)(b), which provides in relevant part:

> (b) Transfer may be made between placement units or from a placement unit to a medical facility other than those specified in pars. (c) to (e) by a guardian or placement facility without approval by a court. When transfer is made by a placement facility, 24 hours' prior written notice of the transfer shall be provided to the guardian, when feasible. If it is not feasible to notify the guardian in advance, written notice shall be provided

immediately upon transfer, and notice shall also be provided to the court and to the board designated under s. 55.02 or an agency designated by it within a reasonable time, not to exceed 48 hours from the time of the transfer . . . .

Sec. 55.06(9)(b) does not limit its application to transfers within the state, nor does it specifically authorize transfers out of state. However, the law in Wisconsin has long been settled that a guardian of an incompetent may not move the residence or domicile of the ward outside the State of Wisconsin. *Carlton v. State Dep't of Pub. Welfare*, 271 Wis. 465, 470, 74 N.W.2d 340 (1956) (guardian cannot cause the ward's domicile to be changed to a place in a state other than the one in which the appointment was made); *see also Juneau County v. Sauk County*, 217 Wis. 2d 705, 713–14, 580 N.W.2d 694 (Ct. App. 1998) (recognizing *Carlton*'s holding that "the domicile of an adult incompetent cannot be moved outside of the State of Wisconsin simply by the movement of the guardian"). Likewise, because the finding of incompetence makes the ward unable to make legal decisions on her own behalf, *see Guerrero v. Cavey*, 2000 WI App 203, ¶¶ 18–23, 238 Wis. 2d 449, 617 N.W.2d 849, the domicile of an adult incompetent has been limited to the county of residence when the ward became incompetent, or another county in the state if the guardian moved there, *see Waukesha County v. B.D.*, 163 Wis. 2d 779, 788, 472 N.W.2d 563 (Ct. App. 1991). These limitations prohibited out-of-state moves of incompetent wards at the time the actions in this case occurred.

■

¶ 57. *Carlton* was decided well before the 1973 creation of WISCONSIN STAT. ch. 55, governing the Protective Service System, *see* 1973 Wis. Laws, ch. 284, § 9,

and before the creation of WIS. STAT. § 55.06(9)(b)[9] in 1975, *see* 1975 Wis. Laws, ch. 393, § 16. "The legislature is presumed to act with full knowledge of existing case law when it enacts a statute." *Strenke v. Hogner*, 2005 WI 25, ¶ 28, 279 Wis. 2d 52, 694 N.W.2d 296. Based on this rule of statutory construction, we conclude that § 55.06(9)(b) applies solely to in-state transfers.[10] *See Strenke*, 279 Wis. 2d 52, ¶ 28 ("A statute must be interpreted in light of the common law and the scheme of jurisprudence existing at the time of its enactment."). Had the legislature wanted to allow incompetents subject to protective placement protections to be moved out of state without court approval, it could have made those provisions. It did not do so.

[3]

¶ 58. We conclude that WIS. STAT. § 55.06(9)(b) did not authorize Linda to move Catherine out of state, change her domicile and transfer the guardianship to Connecticut, all without prior approval. When Linda removed Catherine from the State of Wisconsin, she did so in the face of case law that specifically prohibited such removal, and relied upon a statute that was silent on the subject. That was a slim reed upon which to build a claim of unfettered authority to change an incompetent ward's domicile.

---

[9] WISCONSIN STAT. § 55.06(9)(b) has been amended slightly since its creation in 1973, but the first three sentences of § 55.06(9)(b), quoted in ¶ 56 above, remains substantially the same.

[10] Our conclusion is consistent with *Juneau County v. Sauk County*, 217 Wis. 2d 705, 713–14, 580 N.W.2d 694 (Ct. App. 1998), decided well after WIS. STAT. § 55.06(9)(b) was created, which recognized the holding in *Carlton v. State Department of Public Welfare*, 271 Wis. 465, 470, 74 N.W.2d 340 (1956).

¶ 59. Our conclusion is consistent with the supreme court's recent examination of a case also involving the relocation of an incompetent ward. *See Jane E.P. v. Unified Bd. of Grant & Iowa Counties*, 2005 WI 106, 283 Wis. 2d 258, 700 N.W.2d 863. *Jane E.P.*, which was decided in July 2005, after the orders at issue in the instant case were entered, involved a proposal to move an incompetent ward from Illinois to Wisconsin. *Id.*, ¶¶ 3–4. The decision reflects the court's intent that forum shopping by guardians be discouraged, while at the same time providing a court-monitored system so that legitimate needs to move incompetent relatives from one state to another can be accommodated in a reasonable way. The court observed:

> "Interfamily conflict or attempts to thwart jurisdiction may occur less frequently, but still cause significant problems for courts. Guardians and family members, for example, may engage in forum shopping for Medicaid purposes or for state laws governing death and dying that are compatible with their views or the views of the ward."

*Id.*, ¶ 11 n.9 (quoting National Probate Court Standard 3.5, Commission on National Probate Court Standards and Advisory Committee on Interstate Guardianships, a Project of the National College of Probate Judges and the National Center for State Courts).

¶ 60. *Jane E.P.* held that in the absence of legislative direction concerning the resolution of multi-jurisdictional issues in guardianship cases, the court would "set forth standards for Wisconsin courts to follow when confronting cases associated with the interstate transfer of guardianships." *Id.*, ¶¶ 27–28. In formulating those standards, the supreme court adopted the standards and procedures of an addendum

to the National Probate Court Standards to be applied for the interstate transfer of guardianships. *Id.*, ¶ 31.

¶ 61. As relevant to this case, *Jane E.P.* emphasized the need for providing advance notice of an intended transfer of guardianship, and an opportunity to file an objection and request a hearing on the petition, as outlined in Standard 3.5.3 of the National Probate Court Standards.[11] *Id.*, ¶ 37. *Jane E.P.* explained that the intent of Standard 3.5.3, as discussed in the Commentary to that Standard, "is to facilitate the transfer of guardianships to another state in cases in which the court is satisfied that the guardianship is valid and that the guardians have performed their duties properly in the interests of the ward for the duration of their appointment." *Id.*, ¶ 38. "The Standard is based on the presumption that most guardians are acting in the interest of the ward and that the notice and reporting requirements, and the opportunity to bring objections to the transfer to the attention of the

---

[11] Standard 3.5.3 of the National Probate Court Standards provides:

(a) Upon receipt of proper notice of an intended transfer of a guardianship, and a satisfactory final report of the guardian, and in the absence of meritorious objections by interested persons, the probate court should transfer the guardianship to a foreign jurisdiction within a reasonable amount of time.

(b) The ward and all interested persons should be served with proper notice of the intended transfer and be informed of their right to file objections and to request a hearing on the petition.

(c) The final report of the guardian should contain sufficient information for the court to determine that the general plans for the ward and his or her assets in the foreign jurisdiction are reasonable and sufficient.

*Jane E.P. v. Unified Bd. of Grant & Iowa Counties*, 2005 WI 106, ¶ 37, 283 Wis. 2d 258, 700 N.W.2d 863.

court, are sufficient checks on the appropriateness of the transfer." *Id.* (footnote omitted).

¶ 62. Under *Jane E.P.*, it is clear that a guardian must request the circuit court's permission to transfer the guardianship to another jurisdiction, and must, in doing so, give interested persons an opportunity to be heard. *Jane E.P.*, although decided after the circuit court's orders in this case, is consistent with our conclusion that WIS. STAT. § 55.06(9)(b) did not give Linda the authority to move Catherine to Connecticut without prior approval.

¶ 63. For these reasons, we conclude, contrary to the circuit court, that Linda lacked the authority to move Catherine to Connecticut and change her domicile without prior court approval. In doing so, we affirm on different grounds the circuit court's decision that the transfer should not have occurred. *See Vanstone v. Town of Delafield*, 191 Wis. 2d 586, 595, 530 N.W.2d 16 (Ct. App. 1995) (court may affirm on grounds different than those relied on by the circuit court).

**B. Review of the transfer under WIS. STAT. § 55.06(9)(b)**

¶ 64. At the circuit court and on appeal, Linda makes a variety of arguments with respect to the review process of WIS. STAT. § 55.06(9)(b). She argues that: (1) a guardian of the person is not required to obtain court approval before or after transferring a ward to a less restrictive facility; (2) a guardian of the person is not required to give notice to the court, guardian ad litem or other interested persons prior to transferring a ward to a less restrictive facility; (3) a guardian's transfer of a ward to a less restrictive

facility is not subject to a § 55.06(9)(b) review; (4) "[w]hen a guardian establishes that a transfer is consistent with the purposes of [§ 55.06(9)(a)] and that the transfer is to a less restrictive facility, the guardian has established probable cause that the transfer is 'necessary for the best interest' [of the ward] because the 'necessary for the best interest' language refers to the transfer, not to any specific unit or facility"; and (5) a guardian ad litem does not have standing to file a petition to review a transfer under § 55.06(9)(b).

¶ 65. Underlying these arguments is Linda's assumption that WIS. STAT. § 55.06(9)(b) authorizes transfers to less restrictive facilities in other states without prior court approval—an assertion we have rejected. Having concluded that § 55.06(9)(b) does not grant Linda authority with respect to out-of-state transfers, it is unnecessary to consider the powers it confers on guardians to transfer wards within the state without prior court approval and whether "necessary for the best interest" refers to the need for a less restrictive environment or the transfer. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (cases should be decided on the "narrowest possible ground").

¶ 66. However, we do address Linda's fifth issue: whether a guardian ad litem has standing to file a petition to review a transfer under WIS. STAT. § 55.06(9)(b). That statute provides that certain persons may seek review of a transfer of a ward; these persons include: "a guardian, ward, or attorney, or other interested person specifying objections to a transfer . . . ." *Id.* The guardian ad litem is entitled to petition for review as an "interested person," which is defined as "any adult relative or friend of a person to be protected under this subchapter; or any official or

667

representative of a public or private agency, corporation or association concerned with the person's welfare." Wɪs. Sᴛᴀᴛ. § 55.01(4). A guardian ad litem appointed by the circuit court to represent the ward's best interest becomes an "official" of a "public agency . . . concerned with the person's welfare" by virtue of that appointment. We conclude that the guardian ad litem falls within the definition of "interested person" in the protective placement system of ch. 55. Consequently, a guardian ad litem can petition to review a transfer using the procedure outlined in § 55.06(9)(b). That is precisely what the guardian ad litem did in this case. We discern no error.

### C. Removal of Linda as guardian of the person

¶ 67. Linda argues that she should not have been removed as guardian of Catherine's person because the motion to remove her was improperly filed, and because there was insufficient evidence to support the circuit court decision to remove her.

### 1.Notice requirements for removing a guardian of the person

¶ 68. Linda contends that because the previous order to appoint her guardian of Catherine's person was final in 2003, any effort to remove her as guardian must be brought under the procedure outlined in Wɪs. Sᴛᴀᴛ. § 879.01, which provides:

> **Petitions to court.** All applications to courts, except motions in matters at issue, shall be made by verified petition. All petitions must show the jurisdiction of the court and the interest of the petitioner. All petitions, except those for statutory certificates or for ex parte orders in proceedings already pending, shall also show

the names and post-office addresses of all persons interested, so far as known to the petitioner or ascertainable by him or her with reasonable diligence; and shall indicate who are minors or otherwise under disability, and the names and post-office addresses of their guardians. No defect of form or substance in any petition may invalidate any proceedings.

It is undisputed that Linda did not have twenty days' notice, *see* WIS. STAT. § 879.05(2), before the first hearing on Wayne's petition to remove her as guardian, which was conducted on February 4, 2005.

¶ 69. In response, Wayne contends that his motion to remove Linda as guardian was a "motion[] in matters at issue" not subject to WIS. STAT. § 879.01.[12] Wayne argues that instead, notice must be provided consistent with the guardian removal statute, WIS. STAT. § 880.16(2), which provides: "When any guardian fails or neglects to discharge the guardian's trust the court may remove the guardian after such notice as the court shall direct to such guardian and all others interested." Wayne implicitly recognizes that there is no specific method of notice or required advance notice under § 880.16(2), and he asserts that providing notice in

---

[12] WISCONSIN STAT. § 879.01 provides:

All applications to courts, *except motions in matters at issue*, shall be made by verified petition. All petitions must show the jurisdiction of the court and the interest of the petitioner. All petitions, except those for statutory certificates or for ex parte orders in proceedings already pending, shall also show the names and post-office addresses of all persons interested, so far as known to the petitioner or ascertainable by him or her with reasonable diligence; and shall indicate who are minors or otherwise under disability, and the names and post-office addresses of their guardians. No defect of form or substance in any petition may invalidate any proceedings.

(Emphasis added.)

accord with the five-day rule established in WIS. STAT. § 801.15(4) and local practice was sufficient.

■

¶ 70. We agree with Wayne that a WIS. STAT. § 879.01 petition is not necessarily required in order to move to remove a guardian, and that WIS. STAT. § 880.16(2) controls the outcome in this case. We further conclude that Linda received adequate notice under § 880.16(2) to proceed with her removal as guardian. Because a guardian of the person can exercise enormous power that directly and immediately affects the ward, allowing shorter notice of motions to remove in cases involving guardians, particularly in matters involving protectively placed individuals, is fully consistent with the court's goal of protecting the incompetent.

¶ 71. It is undisputed that on January 27, 2005, Linda's attorney, Cavey, was informed about the February 4, 2005 court date at which Linda's removal would be addressed. Although Cavey indicated in correspondence to the circuit court that she would not be present, she did not seek an adjournment. However, out of concern for providing Linda with adequate notice, the circuit court continued the hearing until February 18, 2005. It is undisputed that Linda and Cavey explicitly elected not to appear at that hearing, citing a fear of waiving Linda's claim that the circuit court lacked competency to proceed on Wayne's motion. Instead, Linda filed numerous written responses and motions at the circuit court, and a motion in the court of appeals to stay the circuit court proceedings. There is no evidence that Cavey had any conflict which made her appearance impossible on the February 18 date, or that she sought an adjournment to another date. Under these facts, we are satisfied that Linda, and her counsel, had sufficient notice of the hearing, and could have asked for a delay

if more time was needed to prepare. Linda had sufficient notice to file substantial documents with the circuit court and a thirty-five page motion with over one hundred pages of attachments with the court of appeals by the date of the hearing to which she objects. We reject Linda's claim that she had such inadequate notice of the removal proceedings as to require reversal of the circuit court's order.

### 2. Whether there were grounds to remove Linda as guardian of Catherine's person

■

¶ 72. Linda argues that she should not have been removed as guardian of Catherine's person. A circuit court has authority to remove a guardian for cause pursuant to Wis. Stat. § 880.16(2), which provides: "When any guardian fails or neglects to discharge the guardian's trust the court may remove the guardian . . . ." We generally construe the word "may" in a statute as allowing for the exercise of discretion. Rotfeld v. DNR, 147 Wis. 2d 720, 726, 434 N.W.2d 617 (Ct. App. 1988). A circuit court's discretionary determination will be affirmed if the court makes a rational, reasoned decision and applies the correct legal standard to the facts of record. Sellers v. Sellers, 201 Wis. 2d 578, 585, 549 N.W.2d 481 (Ct. App. 1996). We accept all findings of fact made by the circuit court unless they are clearly erroneous. Wis. Stat. § 805.17(2); Kohl v. Zeitlin, 2005 WI App 196, ¶ 28, 287 Wis. 2d 289, 704 N.W.2d 586.

¶ 73. Applying these standards, we affirm the circuit court's decision to remove Linda as guardian of Catherine's person. In making its decision to remove Linda, the circuit court found that Linda had put her own self-interests above those of her ward, and had

failed Catherine by refusing to cooperate with the circuit court in obtaining information. These findings are supported by the record, and serve as an adequate basis for the circuit court's decision to remove Linda as guardian.

¶ 74. There was evidence presented that Linda secretly removed Catherine from Wisconsin, and that once Catherine was in Connecticut, Linda allowed Wayne to have only phone contact with Catherine monitored by Linda, despite court orders allowing him to have contact with his mother. Linda obstructed Wisconsin court orders requiring disclosure of medical information about Catherine. Linda also interfered with Catherine's ability to communicate with her son, her guardian ad litem and her adversary counsel. She controlled Catherine's telephone contact with everyone by insisting that calls be placed through Linda's own cell phone. She took Catherine out of the Connecticut facility for a day so as to thwart Wayne's pre-arranged visit with his mother. Linda also obstructed the guardian ad litem's attempts to investigate what would be in Catherine's best interest. All of these facts support the circuit court's finding that Linda was acting in her own self-interest, rather than in Catherine's best interest, which we conclude is a failure "to discharge the guardian's trust." *See* WIS. STAT. § 880.16(2).

¶ 75. The unnecessary escalation of conflict, occasioned by the secret move to Connecticut, also supports the finding that Linda was not acting in Catherine's best interest. The record is replete with evidence that Linda and Wayne cannot agree on their mother's care, and that they have litigated numerous issues for years. Despite knowing Wayne would be upset by the secret move, and that further litigation would likely occur,

Linda nonetheless chose to disengage from the ongoing discussion in the circuit court and unilaterally move her mother to Connecticut where not only Wayne, but the guardian ad litem and the guardian of the estate, would have much greater difficulty monitoring Catherine's condition and responding to her needs. It was reasonable for the circuit court to find that these actions justified removing Linda as guardian of Catherine's person pursuant to Wis. Stat. § 880.16(2).

¶ 76. Finally, the circuit court also implicitly found that removing Linda as Catherine's guardian of the person was in Catherine's best interest. There was evidence presented that Catherine has suffered great stress due to the ongoing family conflict. The circuit court reasonably exercised its discretion when it installed a neutral guardian of the person.

¶ 77. For all of the foregoing reasons, we affirm the circuit court's decision to remove Linda as guardian of Catherine's person.

*By the Court.*—Order affirmed.

¶ 78. FINE, J. (*dissenting*). There are times when the government should just step out of the way and let people handle their own affairs. This, in my view, is one of those times.

¶ 79. Catherine P. wanted her daughter, Linda L., to manage her affairs if she needed care and oversight. Accordingly, in November of 1999, Catherine P. executed a Durable Power of Attorney grant to her daughter, Linda L. *See* Wis. Stat. §§ 243.07, 243.10. At the time, Catherine P.'s address was in Milwaukee and Linda L. lived in Connecticut. Additionally, although Catherine P.'s son, Wayne P., lived in Milwaukee, Linda L.'s power of attorney to act for Catherine P. specifically provided that it "shall include all household furniture,

furnishings, tangible personal property and personal effects located in Wisconsin and Florida."[1]

¶ 80. On the same day that Catherine P. gave to Linda L. the Durable Power of Attorney, Catherine P. also executed a Power of Attorney for Health Care. *See* WIS. STAT. ch. 155. The Power of Attorney for Health Care designated Catherine P.'s husband Ernst H. P. to be her "health care agent for the purpose of making health care decisions on my behalf," if Catherine P. "ever [should] have incapacity" and is "no longer able to make health care decisions for myself, due to my incapacity." Catherine P. designated Linda L., even though she lived in Connecticut, as an alternate health-care agent if Catherine P.'s husband could not fulfill that responsibility. Ernst H. P. died in October of 2001.

¶ 81. J. Patrick Ronan, Esq., was the family lawyer for Catherine and Ernst H. P. He drafted Catherine P.'s Durable Power of Attorney and the Power of Attorney for Health Care that she executed in November of 1999. In an affidavit to the Connecticut probate court with jurisdiction over Linda L.'s application to be appointed as Catherine P.'s conservator in Connecticut, he explained why Catherine P. looked all the way to Connecticut for someone to handle her affairs if she became incompetent. Ronan's affidavit related that both Ernst and Catherine P. had a strained relationship with their son Wayne and his incessant prodding for them to give him money and property. He recalled:

> In direct contrast to the great deal of faith and trust [Catherine P.] and [Ernst H. P.] placed in Linda, we spent considerable time on [the day the power of attorney forms were executed by Catherine P.] discuss-

---

[1] Catherine P. and her husband Ernst H. P. had a house in Florida.

ing the fact that [Catherine P.] and [Ernst H. P.] were adamant that Wayne not exert any control or decision-making authority over [Catherine P.] and [Ernst H. P.]'s estates, to the point that they insisted that I be appointed their successor trustee (to succeed, first, Linda and then her husband, Steve L[.] as trustee) for the trust they created for their son.

¶ 82. Ten days after Ernst H. P. died in October of 2001, Wayne took Catherine P. to a lawyer's office and had her revoke the November 1999 powers of attorney. The Milwaukee County circuit court later determined that Catherine P. was not competent to do so. Although the court also revoked all prior powers of attorney, it appointed Linda L. as Catherine P.'s guardian of the person, and made the following finding: "That in listening to the testimony of Linda L[.] and Wayne P[.] the Court determines that it is satisfied that Linda L[.] is better equipped to handle her mother's needs and will cooperate in sharing placement of Catherine P[.] with Wayne P[.] as ordered below."

¶ 83. The court's placement schedule provided that Catherine P. "shall reside" in Florida during December, January, February, and March, in Connecticut with Linda L. during April, May, June, and July, and in her home in Wisconsin with Wayne P. during August, September, October, and November. The order further provided that Wayne P. and Linda L. "shall each reside with their mother at her home for two months each per year and shall attempt to alternate the two month stays between them such that each shall have an opportunity to spend alternating Christmas's [sic] with their mother."

¶ 84. The circuit court appointed Leonard Brady, Esq., as the guardian of Catherine P.'s estate, and directed him to "remove[]" Wayne P.'s name "from any title or document of interest" in a "Chaparelle boat and

GMC Suburban automobile" that Wayne P. had purchased with his mother's money while she was incompetent. The circuit court also directed Brady to see how much of Catherine P.'s assets should be paid to Wayne P. for "services rendered" by him "in caring for his mother during the pendency of this action," not to exceed "$54,750 on an annualized basis."

¶ 85. As the Majority recounts, the circuit court, a different judge presiding, later removed Linda L. as Catherine P.'s guardian of the person, and this appeal stems from that. As the Majority also observes, whether to remove a guardian of a person is in the circuit court's reasoned discretion. A court reasonably exercises its discretion when it applies the material legal principles to a rational analysis of the pertinent facts. *See McCleary v. State*, 49 Wis. 2d 263, 277–278, 182 N.W.2d 512, 519–520 (1971). In my view, the circuit court did not do that here when it removed Linda L. as Catherine P.'s guardian.

¶ 86. As applicable to this case, the statute setting the grounds for removal of a guardian is, as the Majority writes, Wis. Stat. § 880.16: "When any guardian fails or neglects to discharge the guardian's trust the court may remove the guardian after such notice as the court shall direct to such guardian and all others interested." Sec. 880.16(2). This is a plain and common-sense provision and the "guardian's trust" must, perforce, focus on the ward's best interests because the appointment of guardians to act for their wards is in lieu of judicial micromanagement of what is or is not best for the ward. *See James v. Roberts*, 203 Wis. 89, 94–95, 233 N.W. 563, 565 (1930). Thus, a guardian may not be removed merely because the court would have acted differently if clothed with the guardian's powers. *Id.*, 203 Wis. at 95, 233 N.W. at 565 ("Merely because the judge of the county court, if

676

acting as guardian, might have followed a different course does not warrant the removal of a guardian, the changing of a well-worked out plan, or the transfer of the custody of the ward from the place selected by the guardian."). Therefore, "[t]o justify interference with a guardian's control, there must be some positive misbehavior, want of integrity, or negligence affecting the ward's welfare." *Id.*, 203 Wis. at 95–96, 233 N.W. at 565. I examine against these prerequisites the reasons given by the circuit court to remove Linda L. as her mother's guardian, and also the Majority's reasons to affirm. In my view, there is *no evidence* in the Record, and the Majority points to none, that even hints, no less proves by any standard of proof, that Linda L. was guilty of: (1) "positive misbehavior"; or (2) "want of integrity"; or (3) negligence that adversely affected Catherine P's welfare.

¶ 87. The trial court made the following "findings," in a document headed "SUPPLEMENTAL FINDINGS AND ORDER ON MOTION TO REMOVE GUARDIAN OF THE PERSON," as support for its order removing Linda L. as Catherine P's guardian:

1. "Linda L[.] has put her self-interests above her ward Catherine P[.]"

2. Linda L. "interfere[ed] inappropriately with Court Orders previously issued; particularly with regards to this Court's attempt to obtain additional information on whether or not it is feasible to return Catherine P[.] to Wisconsin."

3. Linda L.'s "behavior is found to be frustrating to the Court process, and the Court is further distressed over [Linda L.'s lawyer]'s failure to appear at these hearings, while still filing Motions in opposition to the proceedings."

4. "There is good cause to remove Linda L[.] as Guardian of the Person of Catherine P[.]"

677

¶ 88. Items 1 and 4 are conclusions of law, to which we owe no deference. *See State v. Ward,* 153 Wis. 2d 743, 745, 452 N.W.2d 158, 159 (Ct. App. 1989). Significantly, the trial court did not support these self-described "findings" with any "facts"—what was Linda L.'s "self-interest" that she allegedly "put . . . above" those of her mother and how did she do it? Similarly, item 2 is also, essentially, a conclusion of law that is bereft of supporting facts. Further, before a guardian may be removed, the guardian must have done something that hurt the ward, *see James,* 203 Wis. at 95–96, 233 N.W. at 565, and there is also nothing in item 2 that shows how or why the alleged inappropriate interference harmed Catherine P. Indeed, the Majority concedes that facilities in either Connecticut or Wisconsin would have served Catherine P.'s needs equally as well. Majority, ¶ 42.

¶ 89. Item 3, an expression of the trial court's "frustration" and "disress" in connection with its calendar-management, is similarly bereft of any nexus of harm to Catherine P.

¶ 90. In sum, the circuit court's "findings" do not show that, as required by *James,* Linda L. was guilty of: (1) "positive misbehavior"; or (2) "want of integrity"; or (3) negligence adversely affecting Catherine P.'s welfare. Thus, we should reverse, *see id.,* 203 Wis. at 95–96, 233 N.W. at 565, but the Majority affirms and gives equally vague reasons. It sets them out in paragraphs 73 through 75 of its opinion.

1.

¶ 91. "In making its decision to remove Linda, the circuit court found that Linda had put her own self-interests above those of her ward, and had failed

Catherine by refusing to cooperate with the circuit court in obtaining information." Majority, ¶ 73. Although the Majority opines: "These findings are supported by the record, and serve as an adequate basis for the circuit court's decision to remove Linda [L.] as guardian," *ibid.*, it, too, does not explain either *how* the findings are supported by the Record, or *how* the alleged "refus[al] to cooperate with the circuit court in obtaining information" put Linda L.'s "self-interest above those of her" mother.

¶ 92. Critically, insofar as the required *James* analysis is concerned, there is no evidence that Linda L. either profited or sought to profit from her mother's incapacity. This is in stark contrast to Wayne P., who not only used his mother's funds to secure a boat and a sports utility vehicle, which the trial court ordered him to disgorge, but, unlike Linda L., also sought significant payment for taking care of his mother.

### 2.

¶ 93. Other than paragraph 75's accurate assertion that Linda L. moved Catherine P. to Connecticut without giving anyone advance notice, there is nothing in that paragraph that sets out any fact supporting the paragraph's wide-ranging generalizations. Further, many of those generalizations appear to come from either the arguments by the lawyers arrayed against Linda L. or from those lawyers' hearsay assertions. This is not *evidence* from which Catherine P.'s future should hang.

¶ 94. Further, *nothing* in paragraphs 74 or 75 shows that Linda L. was acting for her own interests rather than those of her mother. As for the "secret" move, the clear language of Wis. Stat. § 55.06(9)(b) permitted it, and one of the circuit court judges hearing

this case agreed with Linda L.'s assessment of that language. That the Majority and another of the circuit judges who heard this case disagree, does not make what Linda L. did either "positive misbehavior" or a display of a "want of integrity." *See James*, 203 Wis. at 95–96, 233 N.W. at 565. Certainly, it shows that Linda L.'s position was, at the very least, arguable. I do not discuss the merits of either position, however, because there is nothing in the Record that shows that Linda L. was not acting in her good-faith belief that her mother would be better off in Connecticut than in Wisconsin. Stated another way, although Linda L. might have been right or she might have been wrong, she did not move her mother for anything other than the loftiest of motives—Catherine P.'s well-being. Indeed, there is significant evidence in the Record that supports her belief that moving her mother to Connecticut was the only way she could assure Catherine P. a peaceful place to live, without what the Record shows to be Wayne P.'s interference.

¶ 95. In support of Linda L.'s application to be appointed by the Connecticut probate court as Catherine P.'s conservator, she submitted to the Connecticut court, and it is part of the Record before us, an affidavit executed on February 18, 2005, by the administrator of the nursing home in which Catherine P. lived from November 8, 2003, to December 21, 2004, when Linda L. moved her to Connecticut. The administrator related the following insofar as Catherine P.'s health and well-being was concerned:

- "It was evident that Linda L[.] and Wayne P[.] love their mother and that [Catherine P.] loves them."

- Linda L. "worked hard to improve the quality of her mother's life, she was pleasant to work with, and she

680

brought about a positive improvement in her mother's physical and emotional health."

• "My interactions with Wayne P[.] and his wife, Beth P[.] were in direct contrast to my interactions with Linda L[.]"

• "Mr. P[.] frequently attempted to countermand directives made by staff for his mother's health and safety. This behavior gradually subsided through 2004.

• "At a time when [Catherine P.] was on a restricted diet of soft foods, Mr. P[.] tried to give to his mother foods which presented a choking hazard to her."

• "At a time when Catherine P[.]'s physical therapist prescribed leg braces to attempt to correct contractures, Mr. P[.] insisted on removing his mother's leg braces and, in fact, did remove them."

• "Wayne P[.] repeatedly interfered with the staff's ability to care for [Catherine P.] by telling his mother that she would be going home and that she belonged home. Mr. P[.] repeatedly told his mother that he and Beth were her appropriate caregivers. [Catherine P.] was visibly distressed by these discussions."

• "Wayne P[.] and his wife, Beth, would frequently disparage Linda L[.] to" Catherine P.

• "I never heard Linda L[.] or her husband or her children make any negative comments about Wayne and/or Beth P[.] to" Catherine P.

• "Wayne P[.] and his wife, Beth, would frequently disparage Linda L[.] to me."

• Wayne P. wanted to have his mother's physician discontinue the administration of two pharmaceuticals that, according to the medical staff, were helping to restore Catherine P.'s cognitive abilities, and Catherine P.'s physician did not know why.

681

- "Frequently, when Mr. P[.]'s wife, Beth P[.] visited Catherine P[.] at [the nursing home], she was belligerent, confrontational and appeared intoxicated. She frequently smelled of alcohol."

- Linda L. never interfered with either Wayne P.'s or his wife's visits to Catherine P. at the nursing home.

- As of February 18, 2005, Catherine P.'s Wisconsin court-appointed adversary counsel had not "contacted [the administrator] to discuss any aspect of this matter."

¶ 96. Everything that Linda L. did in this case was to protect and preserve her mother's interests, comfort, and her mother's estate from the predations of her brother, Wayne P. Given Wayne P.'s history of seeking to get money from his mother and to exploit her cognitive disability in order to overturn Catherine P.'s choice of Linda L. as the person who should handle Catherine P.'s financial and health-care affairs if Catherine P. could no longer do so, almost *anything* Linda L. did to protect her mother from Wayne P. would, as phrased by the Majority as another reason why Linda L.'s removal as Catherine P.'s guardian was justified, "upset" Wayne. Majority, ¶ 75. Wayne P.'s interests or feelings, however, are not what the law in this proceeding should protect; rather, Catherine P. has exclusive claim on our concern.

¶ 97. In my view, the Record's revelations that Wayne P. not only tried to interfere with the Milwaukee nursing home's care for his mother, and that he used his mother's money to buy a boat and a sports utility vehicle, and that he took advantage of her incompetency following the death of Ernst H. P. to have her revoke the powers of attorney she gave to Linda L., and, also, that he is seeking significant payment from his

mother's estate to take care of her, are at the heart of this case. Yet, the Majority mentions this only in a passing reference to this Dissent. Majority, ¶ 26 n.6.

¶ 98. Frankly, I find incredible the Majority's assertion in footnote 6 that, in essence, this case has naught to do with Wayne P. In my view, it has *everything* to do with Wayne P. First, his attempt—thwarted by the circuit court when challenged—to exploit his mother's incompetence triggered judicial involvement in what Catherine P., when she was competent, entrusted to Linda L. Second, by removing Linda L. as her mother's guardian, the circuit court has, in essence, not only ignored Catherine P.'s legal directions, which she executed when she was fully competent, but has also given to Wayne P. much of what he sought to accomplish by dragging his incompetent mother to the lawyer and having his mother revoke those legal directions. Third, Catherine P.'s determination that she wanted Linda L. to handle her affairs if she ever became incompetent has not only been overridden by the circuit court without reference to the criteria mandated by *James*, but the circuit court in place of Linda L. has also installed lawyers whose record in this case shows their alignment with Wayne P. Linda L. is in Connecticut, far-removed and is unable, therefore, to exercise fully the oversight over her mother's affairs that her mother wished, a choice Catherine P. made while competent and fully aware that Linda L. lived in Connecticut. Indeed, this fact—Catherine P.'s choice of Linda L. even though Linda L. lived in Connecticut—strongly supports Linda L's decision to move Catherine P. to Connecticut where Linda L. could fully and easily comply with her mother's wishes. In light of the current situation in Milwaukee, the assurance given to us at oral argument by Wayne P.'s lawyer that Wayne P.'s "fingers

are out of the pie; he has nothing to do with it," is not, in my view, wholly comforting.[2]

¶ 99. When I asked Wayne P.'s lawyer at oral argument about one of the circuit judges' findings that Wayne P. had taken money from Catherine P.'s estate, the lawyer responded: "What does that have to do with the price of tea in China?" When asked again about this: "It is relevant to a best-interest determination though, as to who among these two children had the mother's best interests at heart. Isn't that a consideration that the court has to consider?" Wayne P.'s lawyer responded: "No. No, I don't believe that to be true." Sadly, despite Catherine P.'s stated desires when she was competent to express them, the Majority does not either.

¶ 100. When she gave Linda L. the powers of attorney, Catherine P. was competent to protect her own interests. As Ronan's affidavit based on his personal observations points out, Catherine P. deliberately chose Linda L. and not Wayne P. to protect her interests if she ever became disabled, even though Wayne P. lived in Milwaukee and Linda L. lived in Connecticut. Now that she is disabled, the legal system, the government, has vetoed Catherine P.'s choice, and the four lawyers involved (other than those retained by Wayne P. and Linda L.) are feeding off of Catherine P.'s estate. This is money that Catherine P. presumptively wanted to preserve not only for her post-disability comfort, but also to keep in trust for Wayne P. Removing Linda L. as the decision-maker for her mother defeats not only Catherine P.'s wishes but also the legislative intent that

---

[2] The "it" presumably refers to the administration of his mother's affairs and estate.

persons be able to select someone they trust to manage their affairs when they are no longer competent. Accordingly, I respectfully dissent.